## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel. JOHN DOAK
INSURANCE COMMISSIONER, AS RECEIVER
FOR PARK AVENUE PROPERTY &
CASUALTY INSURANCE COMPANY

      Plaintiff,

vs.                                                                 CASE NO:  CIV-12-457-HE

PYRAMID DIVERSIFIED SERVICES, INC.          (Removed from District Court,
d/b/a SIMPLE HR,                                              Oklahoma County, Oklahoma;
                                                                          Case No.: CJ-2012-1425)

      Defendant.


## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Robert C. Byerts
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee FL  32308
850.878.6404
rbyerts@dealerlawyer.com

Kenneth A. Tillotson, OBA No. 19237
Phillips Murrah P.C.
Corporate Tower, Thirteenth Floor
101 N. Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-4100
E-mail: katillotson@phillipsmurrah.com

Attorneys for Defendant, Pyramid Diversified
Services, Inc.

# TABLE OF CONTENTS

**Table of Contents**

INTRODUCTION ................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .................................. 1

BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ...................... 9

I.   Introduction ............................................................................................. 9

II.  Standard Of Review ............................................................................... 9

III. PACA Acted As The Agent Of Park Avenue In Soliciting, Procuring, And Maintaining The Workers' Compensation Insurance Coverage for PDS. ............. 10

A.   PACA Had Actual Authority To Act As An Agent For Park Avenue. .............. 10

1.   Applicable Law ............................................................................ 10

2.   Park Avenue Consents For PACA To Act For Park Avenue and PACA Consents To Act For Park Avenue ............................................... 12

3.   PACA Acted Subject To Park Avenue's Control ......................... 13

4.   Further Evidence PACA was Park Avenue's Agent ..................... 14

B.   PACA Had Apparent Authority To Act As An Agent For Park Avenue ........... 15

1.   Applicable Law ............................................................................ 16

2.   Manifestations Of PACA's Apparent Authority .......................... 17

3.   PDS Relied On PACA's Apparent Authority To Act As An Agent For Park Avenue And Changed Its Position To Its Detriment. .................................. 18

a.   PDS Changed Its Position To Its Detriment In Deciding To Enter Into Contracts With PACA Related To The Workers' Compensation Insurance Coverage Provided By Park Avenue. .................................... 18

b.   PDS Changed Its Position To Its Detriment In Entering Into Subsequent Contracts With Park Avenue Directly For Workers' Compensation Insurance Starting In 2005. .................................... 22

C.   Oklahoma Statutes Require An Agency Relationship Between Park Avenue And PACA. .................................. 27

D.   Florida Law Makes PACA An Agent of Park Avenue ...................... 29

IV.  The Receiver Must Recognize PDS's Claims Deposits And Surplus Loan Monies Held By Park Avenue, Submitted Through Park Avenue's Agent, PACA, And Apply Such Monies As An Offset Against PDS's Liabilities. .................. 31

V.   Crediting PDS With The Claims Collateral And Surplus Loan Funds Paid To Park Avenue Supports Summary Judgment On Counts I And III .................................. 34

VI.  Undisputed Facts Show An Equitable Accounting Due ........................................ 35

CONCLUSION ................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Agee v. Gant*, 1966 OK 31, 412 P.2d 155 ....................................................... 11

*Almerico v. RLI Ins. Co.*, 716 So.2d 774 (Fla. 1998) ................................ 31, 32

*Bailey v. Gulf Ins. Co.*, 389 F.2d 889 (10th Cir. 1968) .............................. 33

*Bank of Okla. v. Briscoe*, 911 P.2d 311 (Okla.Civ.App.1996) .................... 11, 12

*Bayless v. Christie, Manson & Woods Int'l, Inc.*, 2 F.3d 347 (10th Cir. 1993) .......... 11, 17

*Beard v. Herndon*, 84 Okla. 142, 203 P. 226 (1921) ................................... 34

*Benham v. Selected Inv. Corp.*, 313 P.2d 489 (Okla. 1957) ........................ 12

*Brown v. Inter-Ocean Ins. Co.*, 438 F.Supp. 951 (N.D. Ga 1977) .............. 32

*Campbell v. John Deere Plow Co.*, 1946 OK 189, 172 P.2d 319 ................ 13, 18

*Clark v. Brien*, 59 F.3d 1082 (10th Cir. 1995) ........................................... 34

*Curtis v. CIA Mach., Inc.*, 1977 OK CIV APP 31, 571 P.2d 862 .............. 11, 12

*Digital Design Group, Inc. v. Information Builders, Inc.*, 2001 OK 21, 24 P.3d 834 ...... 37

*Dunlap v. Shuler*, 193 Okl. 125, 141 P.2d 585 ......................................... 18

*Enterprise Management Consultants, Inc. v. State ex rel. Okla. Tax Comm'n*, 768 P.2d 359 (Okla.1988) ............................................................ 11, 12

*Essex Ins. Co. v. Zota*, 985 So.2d 1036 (Fla.2008) .................................. 31, 32

*Farmers Nat'l Grain Corp. v. Young*, 102 P.2d 180 (Okla. 1940) .............. 12

*Graham v. Lloyd's Underwriters at London*, 964 So.2d 269 (Fla. 2d DCA 2007) .......... 32

*Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947 (10th Cir. 2009) . 39

*Hinson v. Cameron,* 742 P.2d 549 (Okla. 1987) ...................................... 12

*Howell Petroleum Corp. v. Leben Oil Corp.,* 976 F.2d 614 (10th Cir.1992) ................. 38

*Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008) ...................................... 9

*Luther & Sons, Inc. v. Cmty. Nat. Life Ins. Co.*, 307 F.Supp. 93 (N.D. Okla. 1969) ....... 29

*Mason v. Nibel,* 129 Okla. 7, 263 P. 121 (1928) (per curiam) ...................... 34

*Messick v. Johnson*, 1931 OK 736, 8 P.2d 28 ........................................... 29

*Mills v. Mills*, 512 P.2d 143 (Okla.1973) .................................................. 38

*Moss v. Ward*, 450 F.Supp. 591 (W.D. N.Y. 1978) .................................... 10

*Motors Ins. Corp. v. Freeman*, Okl., 304 P.2d 328 .................................... 33

*Reed v. Anderson*, 127 Okl. 64, 259 P. 855 ............................................ 18

*Rice v. Office of Service-members' Group Life Ins.*, 260 F.3d 1240 (10th Cir.2001) .... 9, 10

*Rosser–Moon Furniture Co. v. Oklahoma State Bank,* 135 P.2d 336 (Okla. 1943) .......... 17

*Russell v. Eckert*, 195 So.2d 617 (Fla.2d DCA 1967) .................................. 32

*Scott v. Harris*, 550 U.S. 371, 127 S.Ct. 1769 (2007) ................................ 10

*Shanks v. Travelers' Ins. Co.*, 25 F. Supp. 740 (N.D. Okla. 1938) .............. 30

*Shebester v. Triple Crown Insurers*, 1992 OK 20, 826 P.2d 603 .................. 33

*Sparks Bros. Drilling Co. v. Texas Moran Exploration Co.*, 1991 OK 129, 829 P.2d 951 ........................................................................................................................ 17

St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs., 309 F.3d 680 (10th Cir. 2002) .................................................................................................... 10, 11, 17

*Stephens v. Yamaha Motor Co., Ltd.,* 627 P.2d 439 (Okl.1981) ................................ 17, 18

*Tulsa Co. Truck & Fruit Growers Ass'n. v. McMurphey*, 185 Okl. 132, 90 P.2d 927 ...... 18

*Tulsa General Drivers Union v. Conley,* 288 P.2d 750 (Okla.1955) (per curiam) ........... 34

*Unibridge Sys., Inc. v. Prudential Ins. Co. of Am.*, 43 F.3d 1484 (10th Cir. 1994) .... 17, 18

*Urabazo v. Humpty Dumpty Supermarkets,* 463 P.2d 352 (Okla. Ct. App. 1969) ........... 34

*Whitehorse v. Johnson,* 156 P.3d 41 (Oklahoma 2007) .................................................. 38

## Statutes

Fla. Stat. § 626.015 (2013) .................................................................................................. 28

Fla. Stat. § 626.342 (2013) ............................................................................................ 29, 30

Fla. Stat. § 626.7315 (2013) .................................................................................... 28, 29, 30

Okla. Stat. tit. 36, § 1435.2(7) (2013) ........................................................................... 27, 28

OUJI 23.1 ............................................................................................................................ 34

## Rules

Fed. R. Civ. P. 56 ............................................................................................................... 1, 9

## Treatises

3 Couch on Ins. .................................................................................................................. 29

31 Cyc. 1262 ....................................................................................................................... 31

Restatement 2d, Agency .................................................................................................... 17

**INTRODUCTION**

Defendant, Pyramid Diversified Services, Inc. ("PDS"), moves for entry of partial summary judgment against State Of Oklahoma, ex rel. John Doak Insurance Commissioner, as Receiver for Park Avenue Property & Casualty Insurance Company ("Receiver") on Counts I, II and III of Plaintiff's Complaint as well as Count IV of Defendant's Counterclaim, pursuant to Fed. R. Civ. P. 56.  Undisputed facts and applicable law require the Receiver to credit funds received by its agent, PACA, Inc., and offset those funds against the amounts the Receiver seeks from PDS.  Specifically, the Receiver must offset against its claims against PDS the claims deposit monies held by the Receiver in the amount of $628,502.28, and its surplus note monies held by the Receiver in the amount of $823,903.20.  Offsetting such funds substantially, if not completely, eliminates PDS's liabilities.  PDS provides the following statement of facts and brief in support of this motion for partial summary judgment and requests oral argument on this motion.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. PDS is a professional employer organization (PEO) located in Florida.  (Answer of Pyramid Diversified Services, Inc. d/b/a Simple HR, Doc. #13 ¶2).

2. Park Avenue Property & Casualty Insurance Co. ("Park Avenue"), f/k/a Providence Property & Casualty Insurance Co., was an insurer domiciled in Oklahoma.  (Answer of Pyramid Diversified Services, Inc. d/b/a Simple HR, Doc # 13¶1).

3. PACA, Inc. ("PACA") is a PEO located in Alabama.  [Deposition of Wayne Stark (hereafter "W.S."), pp.15-16].

4. In 2002, Park Avenue agreed to appoint PACA to solicit and provide PEOs with workers' compensation insurance coverage from Park Avenue under the "PACA Program." Exhibit 4; W.S. p. 32, ¶¶14-22; p. 34, ¶¶6-11; p. 46, ¶¶1-7; Deposition of Mark Tharp (hereafter "M.T.") p. 65, ¶¶1-6; p. 74, ¶¶22-25; p. 75, ¶¶1-18; p. 76, ¶¶7-17; p. 87, ¶¶5-11; p. 146, ¶¶8-12.

5. Park Avenue and PACA intended to and did enter into a principal-agent relationship whereby Park Avenue exercised control over PACA's placement of workers' compensation insurance coverage.  Ex.4; W.S. p. 37, ¶¶1-20; M.T. p. 89, ¶¶13-23.

6. PACA marketed workers' compensation insurance coverage from Park Avenue to PEOs.  W.S. p. 63, ¶¶17-20; M.T. p. 65, ¶¶1-6; p. 76, ¶¶7-17.

7. PACA found the PEOs for which PACA ultimately procured and maintained workers' compensation insurance coverage from Park Avenue. W.S. p. 63, ¶¶14-16; M.T. p. 76, ¶¶7-17; p. 87, ¶¶5-11.

8. Park Avenue required PACA to remit the PEO's premium payments, state assessments, and loss adjusting expenses for the workers' compensation insurance coverage Park Avenue provided the PEOs.  Ex.5; W.S. p. 60, ¶¶6-8, 22-25; p. 61, ¶¶1-2; p. 63, ¶¶6-9; M.T. p. 67, ¶¶17-25; p. 68, ¶¶1-7; p. 86, ¶¶16-25; p. 87, ¶¶1-4, 20-23; p. 231, ¶¶7-11.

9. Park Avenue required PACA to remit claims deposits to serve as reserves for the open claims for the workers' compensation insurance coverage of the PEOs. Ex.4; Ex.6; Ex.7; W.S. p. 62, ¶¶3-25; p. 63, ¶¶1-2; M.T. p. 64, ¶¶22-25; p. 67, ¶¶7-16; p. 68, ¶¶1-

2

9; p. 86, ¶¶16-25; p. 87, ¶¶1-4; p. 88, ¶¶6-11; p. 90, ¶¶4-6; p. 121, ¶¶23-25; p. 122, ¶¶1-6; p. 140, ¶¶2-8; p. 176, ¶¶4-6.

10. Park Avenue required PACA to remit capital surplus loans on behalf of the PEOs in order to meet the surplus requirements prescribed by Oklahoma law for the additional workers' compensation insurance coverage of the PEOs.  Ex.4; Ex.6; Ex.7; W.S. p. 61, ¶¶15-25; p. 62, ¶¶1-2; M.T. p. 66, ¶¶1-12; p. 68, ¶¶14-24; p. 71, ¶¶1-7; p. 72, ¶1; p. 119, ¶¶11-21; p. 121, ¶¶23-25; p. 122, ¶¶1-6; p. 195, ¶¶9-20.

11. Park Avenue set the terms and conditions of the workers' compensation insurance coverage provided to the PEOs through PACA, such as coverage limits, claims approval, deductibles, and underwriting requirements.  Ex.4; Ex.8; W.S. p. 60, ¶¶9-17; p. 64, ¶¶16-25; p. 65, ¶¶1-25; p. 66, ¶¶1-5; p. 67, ¶¶18-23; p. 246, ¶¶17-25; p. 247, ¶1; M.T. p. 76, ¶¶18-25; p. 77, ¶¶1-2; p. 87, ¶¶15-19; p. 88, ¶¶1-5, 12-17.

12. Park Avenue required PACA to provide and disclose to Park Avenue all pertinent information about the PEOs.  W.S. p. 60, ¶13-21; M.T. p. 123, ¶¶20-24; p. 124, ¶¶1-4.

13. Park Avenue required PACA to only submit PEOs for workers' compensation insurance coverage from Park Avenue if the PEOs would be profitable to Park Avenue.  W.S. p. 57, ¶¶17-25; p. 58, ¶1; M.T. p. 82, ¶¶21-25; p. 83, ¶¶1-5; Ex.6.

14. Park Avenue retained final approval on all new business submitted by PACA.  W.S. p. 52, ¶¶4-13; p. 53, ¶¶1-25; p. 54, ¶¶1-9; p. 55, ¶¶14-19; p. 58, ¶¶15-25; p. 59, ¶1; M.T. p. 81, ¶¶5-25; p. 82, ¶¶1-4; p. 82, ¶¶8-16; Ex.6; Ex.8.

15. Park Avenue required PACA to monitor loss ratios of the PEOs and terminate any PEO which incurred an excessive loss ratio.  M.T. p. 64, ¶¶12-14; Ex.4; Ex.6.

3

16. PACA received a commission for bringing in new PEO workers' compensation insurance business to Park Avenue.  W.S. p. 36, ¶¶15-22; Ex.4.

17. Park Avenue permitted PACA to negotiate a premium rate for workers' compensation insurance coverage for a PEO that was higher than the premium rate charged by Park Avenue, subject to the terms and conditions set by Park Avenue.  W.S. p. 63, ¶¶20-25; p. 64, ¶¶1-4, 8-14.

18. Park Avenue promised PACA a profit sharing arrangement.  W.S. p. 40, ¶¶15-16; p. 46, ¶¶8-25; p. 47, ¶¶1-5; p. 56, ¶¶9-15; Ex.4.

19. Park Avenue knew each PEO it was insuring through PACA and identified separate premium payments collected, losses, loss ratios, and manual premium attributable to each PEO. PA 03510; W.S. p. 63, ¶¶6-9; M.T. p. 75, ¶¶1-18; p. 76, ¶¶7-25; p. 154, ¶¶2-22; p. 158, ¶¶17-25; p. 159, ¶¶1-6.

20. PACA served as an intermediary between the PEOs and Park Avenue.  W.S. p. 36, ¶¶11-14, p. 60, ¶¶1-5; Ex.4; Ex.9.

21. Park Avenue issued certificates of insurance in the names of the PEOs.  Ex.10; Ex.11.

22. Effective January 1, 2003, Park Avenue issued a policy of insurance for workers' compensation insurance covering PDS, which was solicited, procured, and maintained by PACA on behalf of Park Avenue.  M.T. p. 111, ¶¶5-12; p. 125, ¶¶10-17; p. 129, ¶¶2-5; Ex.10.

23. The PDS policy was conditioned upon PDS' execution of a Surplus Loan Agreement. Exhibit 12; B.L. p. 101, ¶¶7-13; W.S. p. 61, ¶¶15-20; p. 72, ¶¶19-25; p. 73, ¶¶1-2; ; p. 86, ¶¶17-25; ; p. 87, ¶¶1-4.  The Surplus Loan Agreement states, *inter alia*:

4

BORROWER desires to borrow the initial sum of $823.903.20 and may desire to borrow additional amounts, to be used to support the writing of insurance business by an approved carrier such as but not limited to the Providence Property & Casualty Insurance Company, a stock insurer domiciled in the state of Oklahoma ("PPC"), and LENDER desires to lend said sums to BORROWER, to be repaid over eighteen (18) months or according to Article Three below and pursuant to any Addendums below and to the terms of a surplus note made by PPC or another carrier, with the specific terms, provisions and conditions of the surplus note to be set forth at the time of issuance by PPC or the applicable carrier.

…

it is the intention of the parties to this Agreement that such borrowed funds be used:
1. by the BORROWER to enable PPC or another carrier to conduct insurance business and to do so efficiently;
2. to enable PPC or another carrier to comply with any capital or surplus requirement or make good any impairment or deficiency or other requirement for capital or surplus;
3. to defray the expenses and costs incurred by the BORROWER in accessing the insurance of PPC or another carrier or in acquiring a carrier; and
4. to provide a fund for contributions by the BORROWER, at its sole discretion, to the capital or surplus of PPC or another carrier.

Ex.12.

24. In January 2003 and again in 2004, Park Avenue issued a certificate of insurance coverage to PDS to demonstrate to the Florida Department of Business and Professional Regulation the workers' compensation insurance covering PDS which was solicited, procured, and maintained by PACA.  Ex.10; Ex.11; M.T. p. 125, ¶¶10-25; p. 126, ¶¶20-25; p. 127, ¶¶1; p. 129, ¶¶2-5.

25. Park Avenue communicated directly with PDS regarding PDS's workers' compensation insurance coverage solicited, procured, and maintained by PACA. B.L. p. 51, ¶¶22-25; p. 52, ¶¶1-24; p. 53, ¶¶9-15; M.T. p. 128, ¶¶1-6; p. 158, ¶¶17-25; p. 159, ¶¶1-6; p. 233, ¶¶16-22.

26. PACA put PDS in direct contact with Park Avenue concerning issues related to PDS's coverage.  M.T. p. 76, ¶¶23-25; Ex.13.

27. PDS transferred $628,205.26 in claims deposits to PACA in 6 monthly installments of $98,083.71, beginning in January 2003, and 1 installment of $40,000 in April 2004. B.L. p. 37, ¶¶18-25; p. 38, ¶¶1-22; p. 39, ¶¶1-10; p. 82, ¶¶13-25; p. 83, ¶¶1-5; p. 90, ¶¶23-25; p. 91, ¶¶1-2; Ex.14; Ex.15; Ex.16.

28. PACA transferred $2,000,019.50 in claims deposits to Park Avenue in 2 monthly installments of $143,009.75 beginning in January 2003, 4 monthly installments of $303,500 beginning in March 2003, and 4 monthly installments of $125,000 beginning in September 2004.  Ex.17; Ex.18.  These transfers were funded, at least in part, by claims collateral payments from PEOs including PDS. Ex.7; Ex.15; W.S. p. 77, ¶¶12-18; p. 79, ¶¶8-13; p. 82, ¶¶1-7; p. 92, ¶¶1-22; p. 93, ¶¶12-21.

29. PDS transferred $823,903.20 in surplus loan monies to PACA in 18 monthly installments of $45,772.40, beginning in January 2003.  W.S. p. 88, ¶¶22-25; p. 89, ¶¶1-4; p. 203, ¶¶8-12; B.L. p. 101, ¶¶7-13; Ex.14; Ex.16.

30. PACA transferred $3,100,000 in surplus loan monies to Park Avenue's owner Providence Holding, Inc. ("PHI"), under three surplus loan agreements with PHI, beginning in January 2003. W.S. p. 73, ¶¶11-25; p. 74, ¶¶1-14; Ex.19

31. PHI then loaned the money to Park Avenue, and Park Avenue issued PHI a surplus note in return.  Ex.19.  PHI later converted PACA's surplus loan monies, which included the surplus loan monies paid by PDS, into paid-in-capital of Park Avenue and never repaid any of the surplus loan monies.  Ex.10.

32. In November 2004, Park Avenue proposed to directly provide workers' compensation insurance coverage to PDS.  As part of that proposal, Park Avenue required PDS: (a) to agree to loan 17.5% of manual premium to Park Avenue's owner as a Surplus Note or to purchase preferred stock, which requirement Park Avenue deemed satisfied as long as PDS has $823,903 with PACA's owner; and (b) to provide $275,773 in Claims Collateral which requirement Park Avenue deemed satisfied based upon collateral PDS had provided to PACA/Skilstaf.  B.L. p. 105, ¶¶23-25; p. 106, ¶¶1-2; Ex.20. Park Avenue subsequently issued coverage to PDS.  Ex.21.

33. During 2005 PACA, Park Avenue and PDS discussed a portfolio transfer.  W.S. pp.115, 117, 123; Ex.22.  The claims collateral PDS had paid to PACA, PACA had already paid to PPC.  W.S. p.123; Ex.22.  The portfolio transfer was a paperwork exercise to transfer claims.  W.S.p.121, 132. The parties reached an agreement in principle.  Ex.23; Ex.24.  However although the parties observed the terms of the agreement in practice, a document reflecting the agreement was never executed. B.L. p. 60, ¶¶22-25; p. 70, ¶¶20-22; p. 79, ¶¶22-23; p. 101, ¶¶21-24

34. In December 2005, PACA's Wayne Stark told Park Avenue that Park Avenue could now deal directly with PDS on claims and no longer needed to go through PACA. Park Avenue, in turn, so advised PDS. Ex.25. W.S. p.139¶¶5-20.

35. In its December 2005, proposal to provide coverage for 2006, Park Avenue stated, concerning Claims Collateral: "We currently hold $628,205 in Claims Collateral." Ex.26.

36. In its December 2006 proposal to PDS, Park Avenue told PDS it appreciated PDS's business, which Park Avenue had written for two years directly and for two years before that through PACA, and wanted to continue the relationship into the fifth year and following.  Park Avenue reiterated that "we hold $628,000 in claims collateral" under the PACA program which applied for all five years of PDS's coverage, and had initially required capital surplus contributions of 35% of manual in order to write the business, which would be paid back once the triggering mechanism occurs. B.L. p. 106, ¶¶7-10; Ex.27.

37. In April 2007, a Park Avenue internal accounting report from the Controller reflected that Park Avenue held $1,194,213.28 in collateral for PDS, while the Underwriting Manager identified $1.6 million in collateral.  Ex.28; Ex.29.

38. PDS obtained workers compensation elsewhere for 2008 and thereafter B.L. ; p. 43, ¶25 ; p. 44, ¶¶1-4; p. 126, ¶¶15-20.

39. Park Avenue denied PDS the benefit of either the $628,205 in claims collateral or the $823,903 capital surplus loan PDS tendered to Park Avenue through PACA. Ex.30.

40. Park Avenue was placed into liquidating receivership on November 18, 2009. (Answer of Pyramid Diversified Services, Inc. d/b/a Simple HR, doc # 13 ¶1); Ex.30.

41. The Receiver operates in a fiduciary capacity for Park Avenue policy holders like PDS.  Ex.30.

42. PDS made a demand to the Receiver for an accounting and credit for funds paid to Park Avenue.  Ex.30; B.L. pp.134-5

## BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT

### I.      Introduction

PACA solicited PEOs, including PDS, for the sole purpose of providing these PEOs with workers' compensation insurance coverage through Park Avenue.  Park Avenue granted PACA this authority to solicit PEOs for workers' compensation insurance coverage through Park Avenue, subject to Park Avenue's control.  PACA procured and maintained workers' compensation insurance coverage from Park Avenue on behalf of PEOs, including PDS.  In all relevant respects, PACA acted as an agent for Park Avenue.  Therefore, Park Avenue is liable for PACA's actions concerning the worker's compensation insurance coverage for PDS.  The Receiver must credit PDS the payments it made to PACA to offset liabilities allegedly due Park Avenue.

### II.     Standard Of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party has the initial burden of showing the absence of material fact.  The non-moving party has the burden of setting forth evidence exhibiting a genuine issue of fact does exist.  *Rice v. Office of Service-members' Group Life Ins.*, 260 F.3d 1240 (10th Cir.2001).  "[T]he nonmoving party must do more than simply show there is some metaphysical doubt as to the material facts…"" *Larsen v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) quoting *Scott v. Harris*, 550 U.S. 371, 127 S.Ct. 1769, 1776 (2007).  "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is genuine…." *Rice v. Office of Service-*

*members' Group Life Ins.*, 260 F.3d at 1249 (quotation omitted).  A genuine issue of fact

exists only when a reasonable jury could find in the favor of the non-moving party.  *Id*.

Partial summary judgment may be granted on a claim, leaving other claims to be decided

at a later time. *See e.g., Moss v. Ward*, 450 F.Supp. 591, 594 (W.D. N.Y. 1978)

(acknowledging that "[p]artial summary judgment may be issued with respect to one of

several claims" and citing Rule 57's instruction that the "existence of another adequate

remedy does not preclude a judgment for declaratory relief").

### III.    PACA Acted As The Agent Of Park Avenue In Soliciting, Procuring, And Maintaining The Workers' Compensation Insurance Coverage for PDS.

#### A. PACA Had Actual Authority To Act As An Agent For Park Avenue.

Park Avenue's actions authorized PACA to act as an agent for Park Avenue, and

PACA's activities indicate consent to act, and actions, as an agent of Park Avenue,

subject to Park Avenue's direction and control.  *See St. Anthony Hosp. v. U.S. Dep't of*

*Health & Human Servs.*, 309 F.3d 680, 703 (10th Cir. 2002).  This actual authority for

PACA to act as an agent for Park Avenue exists notwithstanding any intention by Park

Avenue and PACA to create, or not create, such an agency relationship.  *Id.*

##### 1.  Applicable Law

The party asserting the existence of an agency relationship has the burden of

proving the "existence, nature and extent of the agency relationship."  *Bayless v. Christie,*

*Manson & Woods Int'l, Inc.*, 2 F.3d 347, 352 (10th Cir. 1993) (quoting *Enterprise*

*Management Consultants, Inc. v. State ex rel. Okla. Tax Comm'n,* 768 P.2d 359, 362

(Okla. 1988)).

Actual authority in "[a] principal-agent relationship may be grounded in a formal arrangement or may be inferred from 'conduct which shows that one is willing for the other to act for it, subject to its control, and that the other consents so to act.' " *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 703 (10th Cir. 2002) (quoting *Bank of Okla. v. Briscoe,* 911 P.2d 311, 317 (Okla. Civ. App.1996); *see also Agee v. Gant*, 1966 OK 31, 412 P.2d 155, 160 ("Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").

"An 'agency' relationship may arise under certain circumstances even where the parties may not have intended to create one." *Curtis v. CIA Mach., Inc.*, 1977 OK CIV APP 31, 571 P.2d 862, 865; *see also St. Anthony Hosp.*, 309 F.3d at 703 (quoting *Bank of Okla.,* 911 P.2d at 317 (" 'It is not necessary that the parties intend to create the legal relationship or to subject themselves to the liabilities which the law imposes upon them as a result of it.'"); *Farmers Nat'l Grain Corp. v. Young*, 102 P.2d 180 (Okla. 1940) (same). "In its essential nature the relationship results from the express or implied consent of one person for another to act on his behalf with regard to some transaction, and if the latter performs the contemplated act he does so as the agent of the former regardless of what he is called." *Curtis*, 571 P.2d at 865 (citing *Farmers Nat'l*, 102 P.2d 180); *see also Enterprise,* 768 P.2d at 362 ("If the facts show control by the principal, then agency can be established regardless of the labels attached by the contract."); *Hinson v. Cameron,* 742 P.2d 549, 557 n. 32 (Okla. 1987) (a principal/agent relationship is determined by the parties' status which is found from surrounding facts and is not

dictated by the contract; in the event of a discrepancy, facts control over contrary

contractual language); *Farmers Nat'l*, 102 P.2d at 185 ("If relations exist which will

constitute an agency, it will be an agency whether the parties understood the exact nature

of the relation or not."). "The relationship may arise from a single transaction." *Curtis*,

571 P.2d at 865 (citing *Benham v. Selected Inv. Corp.*, 313 P.2d 489 (Okla. 1957));

*Campbell v. John Deere Plow Co.*, 1946 OK 189, 172 P.2d 319, 320.

> **2. Park Avenue Consents For PACA To Act For Park Avenue and PACA Consents To Act For Park Avenue.**

Park Avenue and PACA agreed that PACA would act for Park Avenue in

soliciting, procuring and maintaining workers' compensation insurance coverage for

PEOs. PACA and Park Avenue contemplated this as a principal-agent relationship. Ex.4

("We [PACA] will be the only agent, other than General Insurance Managers, with

access to Providence [Park Avenue] and Jerry has agreed that conflicts as to who brought

in a particular Pig [PEO]will be settled in our favor unless there are extenuating

circumstances. Prov [Park Avenue] makes the same money no matter who brings them

in."); W.S. p. 37, ¶¶1-20 (confirming Ex.4 represents terms discussed for the agreement

between Park Avenue and PACA). Even if PACA and Park Avenue disagreed regarding

the intent of their initial agreement, the fact PACA actually marketed, solicited, procured,

and maintained the PEOs' workers' compensation insurance coverage on behalf of Park

Avenue, and Park Avenue knowingly provided such workers' compensation insurance

coverage to the PEOs found by PACA, demonstrates the consent aspect of a principal-

agent relationship by conduct. Therefore, by agreement and conduct, Park Avenue

12

consented for PACA to act for Park Avenue in soliciting, procuring, and maintaining workers' compensation insurance for PEOs from Park Avenue, and PACA consented to act, and did act, for Park Avenue in soliciting, procuring, and maintaining workers' compensation insurance for PEOs.

### 3. PACA Acted Subject To Park Avenue's Control

Park Avenue controlled PACA's solicitation of PEOs for workers' compensation insurance coverage from Park Avenue, as well as PACA's procurement and maintenance of workers' compensation insurance coverage from Park Avenue.  First, Park Avenue required PACA to remit premium payments, state assessments, and loss adjusting expenses for the workers' compensation insurance coverage of the PEOs.  Second, Park Avenue required PACA to remit claims deposits to serve as reserves for the open claims for the workers' compensation insurance coverage of the PEOs.  Third, Park Avenue required PACA to remit capital surplus loans to meet the surplus requirements prescribed by Oklahoma law for the additional workers' compensation insurance coverage of the PEOs.  Fourth, Park Avenue set the terms and conditions of the workers' compensation insurance coverage provided to the PEOs through PACA, such as coverage limits, claims approval, deductibles, and underwriting requirements, just like any other insurer sets for its agents.  Fifth, as required of any insurance agent by an insurer, Park Avenue required PACA to provide and disclose to Park Avenue all pertinent information about the PEOs in order for Park Avenue to accurately write this business and know the risks Park Avenue was insuring.  Sixth, Park Avenue required PACA to only submit PEOs, and the individual client companies of the PEOs, for workers' compensation insurance coverage

13

from Park Avenue if the PEOs, and their client companies, would be profitable to Park Avenue.   To facilitate this aspect of Park Avenue's control over PACA, Park Avenue retained final approval on all new business submitted by PACA.  Seventh, Park Avenue required PACA to monitor loss ratios of the PEOs and terminate any client of a PEO, or the PEO itself, for incurring too high of a loss ratio, in accordance with Park Avenue standards dictating that a 35% loss ratio threshold.  Therefore, PACA's actions as an agent for Park Avenue in soliciting, procuring, and maintaining workers' compensation insurance for the PEOs on behalf of Park Avenue were subject to the control of Park Avenue.

### 4.  Further Evidence PACA was Park Avenue's Agent

The relationship between PACA and Park Avenue resembled any other relationship between an insurer and an insurance agent in all relevant respects.  PACA received a commission for bringing in new PEO workers' compensation insurance business to Park Avenue.  PACA's commission resulted from PACA's negotiation of premium rates for workers' compensation insurance coverage for a PEO that were higher than the premium rate set by Park Avenue, and PACA's retention of the additional premium.  PACA's ability to negotiate a premium rate with the PEO remained otherwise subject to the terms and conditions set by Park Avenue.  Additionally, Park Avenue agreed to provide PACA a share of profits[1] although PACA never received payment.

---

[1] Profit sharing is a common contingent commission given by insurers to its agents in order to encourage its agents to submit business that is more likely to be profitable.

Nevertheless, the agreement for such profit further evidences the agency relationship between PACA and Park Avenue similar to other insurer-insurance agent relationships.

Park Avenue's accounting separated premium payments collected, losses, loss ratios, and manual premium attributable for each PEO.  Ex.5.  Park Avenue's accounting recognized it did business with these "sub" PEOs through PACA, its agent.  Ex.27 (Park Avenue email to PDS states, "PPC appreciates your business which we have written for the past 2 years and 2 years previous as part of PACA.  We want to continue this relationship into the 5th year and many to follow.") Park Avenue issued certificates of insurance in the names of the PEOs.  PACA similarly recognized it served as an intermediary between the PEOs and Park Avenue.

PACA had actual authority to act as an agent for Park Avenue because Park Avenue consented for PACA to act on its behalf, and PACA consented to act, and did act, on behalf of Park Avenue and subject to Park Avenue's control, as demonstrated by agreement and conduct, and further evidenced by the fact PACA's and Park Avenue's relationship resembled that of any other insurer and insurance agent relationship. Accordingly the Court should find PACA had actual authority to act as an agent for Park Avenue, and did so act in soliciting, procuring and maintaining worker's compensation insurance coverage for PDS.

### B.  PACA Had Apparent Authority To Act As An Agent For Park Avenue.

Park Avenue knowingly gave PACA apparent authority to act as an agent for Park Avenue and manifested such to PDS.  PDS then relied on PACA's apparent authority to act as an agent for Park Avenue and changed its position to its detriment in deciding to

15

(1) enter into contracts with PACA related to the workers' compensation insurance coverage provided through Park Avenue and (2) enter into subsequent contracts with Park Avenue directly for workers' compensation insurance starting in 2005.

### 1.  Applicable Law

"'The existence of actual authority between principal and agent is not a prerequisite to establishing apparent authority.'" *St. Anthony Hosp.*, 309 F.3d at 704 (quoting *Stephens v. Yamaha Motor Co., Ltd.,* 627 P.2d 439, 441 (Okla. 1981)); *Bayless*, 2 F.3d at 353.  "'"Apparent authority' of an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing.'" *St. Anthony Hosp.*, 309 F.3d at 704 (quoting *Stephens,* 627 P.2d at 441); *Sparks Bros. Drilling Co. v. Texas Moran Exploration Co.*, 1991 OK 129, 829 P.2d 951, 954; *Rosser– Moon Furniture Co. v. Oklahoma State Bank,*135 P.2d 336, 338 (Okla. 1943).  " '[T]he elements that must be present before a third person can hold the principal for the acts of the agent on the theory of apparent authority are (a) conduct of the principal, (b) reliance thereon by the third person, and (c) change of position by the third person to his detriment.' " *St. Anthony Hosp.*, 309 F.3d at 704 (quoting *Stephens,* 627 P.2d at 441 ); *Sparks Bros.*, 829 P.2d at 954; *Rosser–Moon,*135 P.2d at 338.  "Apparent authority results from a manifestation by the principal to a third person that another is his agent." *Stephens,* 627 P.2d at 441; *Unibridge Sys., Inc. v. Prudential Ins. Co. of Am.*, 43 F.3d 1484 (10th Cir. 1994).  "The manifestation may be made directly to the third person or to the community at large by signs or advertising." *Stephens,* 627 P.2d at 441; *Unibridge*, 43 F.3d 1484.  "[A]pparent authority exists only to the extent that it is reasonable for the

16

third person dealing with the agent to believe that the agent is authorized." *Stephens,* 627

P.2d at 441 (quoting Restatement 2d, Agency, s 8, Comment c). "[W]here the question

of agency is in issue the apparent authority of an agent, and the scope of such authority, it

may be proved by circumstantial evidence." *Campbell*, 172 P.2d at 320-21; *Reed v.*

*Anderson*, 127 Okl. 64, 259 P. 855; *Dunlap v. Shuler*, 193 Okl. 125, 141 P.2d 585; *Tulsa*

*Co. Truck & Fruit Growers Ass'n. v. McMurphey*, 185 Okl. 132, 90 P.2d 927.

## 2. Manifestations Of PACA's Apparent Authority

Park Avenue indicated to PDS, in several ways, that PACA had authority to act as

Park Avenue's agent in matters related to workers' compensation insurance coverage

through Park Avenue. First, Park Avenue issued a policy of insurance for workers'

compensation insurance covering PDS which was solicited, procured, and maintained by

PACA on behalf of Park Avenue. Ex.10; Ex.11; M.T. p. 111, ¶¶5-12; M.T. p. 125, ¶¶10-

17; M.T. p. 129, ¶¶2-5. Second, Park Avenue issued a certificate of insurance coverage

to PDS to demonstrate to the Florida Department of Business and Professional

Regulation the workers' compensation insurance covering PDS which was solicited,

procured, and maintained by PACA. Ex.10; Ex.11; M.T. p. 125, ¶¶10-25; p. 126, ¶¶20-

25; p. 127, ¶¶1; p. 129, ¶¶2-5. Third, Park Avenue covered PDS clients' claims effective

01/01/2003 under the policy of insurance for workers' compensation insurance covering

PDS which was solicited, procured, and maintained by PACA. Ex.10; Ex.11. Fourth,

Park Avenue communicated directly with PDS regarding PDS's workers' compensation

insurance coverage solicited, procured, and maintained by PACA. M.T. p. 128, ¶¶1-6;

M.T. p. 158, ¶¶17-25; M.T. p. 159, ¶¶1-6; M.T. p. 233, ¶¶16-22. PACA reciprocated this

manifestation of apparent authority by disclosing Park Avenue as the only insurer from which PACA was going to procure and maintain workers' compensation insurance coverage for PDS.  PACA put PDS in direct contact with Park Avenue, including copying PDS on communications to Park Avenue concerning issues related to PDS's coverage.  MT p. 76, ¶¶23-25.

### 3. PDS Relied On PACA's Apparent Authority To Act As An Agent For Park Avenue And Changed Its Position To Its Detriment.

PDS relied upon these manifestations of PACA's apparent authority to act as the agent of Park Avenue and changed its position to its detriment in deciding to (1) enter into contracts with PACA related to the workers' compensation insurance coverage provided through Park Avenue and (2) enter into subsequent contracts with Park Avenue directly for workers' compensation insurance starting in 2005.

### a. PDS Changed Its Position To Its Detriment In Deciding To Enter Into Contracts With PACA Related To The Workers' Compensation Insurance Coverage Provided By Park Avenue.

PDS reasonably believed PACA had the authority to collect surplus loan monies on behalf of Park Avenue based upon the manifestations Park Avenue made that PACA had apparent authority to act as the agent of Park Avenue in matters related to the workers' compensation insurance coverage of PDS.  PDS relied on PACA's apparent authority to act as an agent for Park Avenue in entering into a Surplus Loan Agreement with PACA, for the benefit of Park Avenue, sometime after May 5, 2003, and subsequent to the manifestations Park Avenue made to PDS that PACA had apparent authority to act as the agent of Park Avenue.

18

The Surplus Loan Agreement indicates on its face that the surplus loan monies are for the benefit of Park Avenue, and is replete with references to the surplus loan monies supporting the insurance writing business of Park Avenue.  Ex.19.  All references to "or another carrier" are simply overly cautious contractual language because this Surplus Loan Agreement was clearly for the benefit of Park Avenue which had already been providing workers' compensation insurance coverage to PDS for five months.  Ex.19.  The Surplus Loan Agreement dates back to the beginning of Park Avenue's coverage of PDS for workers' compensation insurance.  Ex.19.  Furthermore, the Surplus Loan Agreement indicates on its face that the monies loaned under the agreement will be repaid as Park Avenue repays PACA under a surplus note issued by Park Avenue to PACA.  Ex.19.  Thus, PDS reasonably believed it was in fact doing business with Park Avenue, through its agent PACA, when PDS decided to enter into the Surplus Loan Agreement with PACA.

PACA actually loaned PDS's surplus loan monies to Providence Holding, Inc. ("PHI"), the owner of Park Avenue.  Ex.19. PHI then loaned the money to Park Avenue, and Park Avenue issued PHI a surplus note in return.  *Id.*.  PHI later converted PACA's surplus loan monies, which included the surplus loan monies paid by PDS, into paid-in-capital of Park Avenue and never repaid any of the surplus loan monies.  *Id.*  PDS was never repaid any of the surplus loan monies PDS submitted through PACA, for the benefit of Park Avenue, because the surplus note issued by Park Avenue mentioned in the repayment provision in the Surplus Loan Agreement was actually the surplus note issued by Park Avenue to PHI.  Thus, despite what the Surplus Loan Agreement indicates on its

19

face, there was no surplus note issued by Park Avenue to PACA.  Ex.12.  The repayment

provision in the Surplus Loan Agreement was actually conditioned on Park Avenue's

repayment on a surplus note to PHI and PHI's subsequent repayment to PACA.  Ex.12.

Therefore, PDS relied to its detriment on the apparent authority of PACA to collect

surplus loan monies for the benefit of Park Avenue because the surplus loan monies were

loaned to a holding corporation, PHI, instead of Park Avenue (as the Surplus Loan

Agreement indicated) and so the surplus loan monies were not repaid and became

uncollectible from Park Avenue.

      PDS further relied on PACA's apparent authority to act as an agent for Park

Avenue to its detriment as the Receiver now does not recognize PDS's surplus loan

monies as debt which can be offset against PDS's liabilities to Park Avenue.  If PDS's

surplus loan monies had been loaned to Park Avenue, as indicated on the face of the

Surplus Loan Agreement, and as recognized by Park Avenue's Controller and

Underwriting Manager, then PDS could offset liabilities to Park Avenue with the surplus

loan provided to Park Avenue.  Indeed, the apparent authority Park Avenue gave PACA

means PDS's loan can be used to offset such liabilities as Park Avenue now asserts

against PDS.

      PDS also reasonably believed PACA had the authority to collect claims deposits

on behalf of Park Avenue based upon Park Avenue's representations to PDS concerning

PACA's authority to act as the agent of Park Avenue in matters related to the workers'

compensation insurance coverage of PDS.  Upon such reliance, PDS changed its position

to its detriment by entering into the agreement with PACA requiring claims deposit

monies sometime on or after February 13, 2003.  The PACA agreement provisions requiring claims deposit monies purported to collect 25% of the manual premium amount paid by PDS for workers' compensation insurance coverage through Park Avenue, to be used as reserves for PDS's open claims with Park Avenue.  PDS reasonably believed PACA forwarded the claims deposit monies to Park Avenue, PACA confirmed it had done so (and so did Park Avenue in 2005).  PDS paid Park Avenue these claims deposit monies.  Thus, PDS reasonably believed it was in fact doing business with Park Avenue, through its agent PACA, when PDS decided to enter into the provisions of the PACA agreement requiring claims deposit monies.

After PDS contracted directly with Park Avenue for workers' compensation insurance coverage, Park Avenue denied having PDS's claims deposit monies.  Park Avenue indicated, at times, PACA had to consent to a portfolio transfer in order for Park Avenue to transfer, on its books, PDS's claims deposit monies to PDS's new account with Park Avenue.  At other times after PDS contracted directly with Park Avenue, Park Avenue represented it had PDS's claims collateral.  Ex. 26; Ex. 27; M.T. p. 212, ¶¶2-23.  Park Avenue maintains now that such a portfolio transfer never occurred, and PACA possesses PDS's claims deposit monies.  This effectively left PDS without effective recourse to recover its claims deposit monies from Park Avenue, the entity that received the funds and from which PDS received insurance coverage.  PDS has been denied offset.  Therefore, PDS relied to its detriment on the apparent authority of PACA to collect claims deposit monies for the benefit of Park Avenue when it entered into the PACA agreement requiring claims deposit monies.

Therefore, PDS relied to its detriment on the manifestations from Park Avenue that PACA had the apparent authority to act as its agent when PDS decided to enter into contracts with PACA, on behalf and for the benefit of Park Avenue because (1) PACA loaned PDS's surplus loan monies to PHI, not Park Avenue as indicated by the Surplus Loan Agreement, (2) PACA and Park Avenue have denied their agency relationship during PDS's transition to a direct contractual relationship with Park Avenue, after acting as such for two years, and (3) PDS is now unable to recoup under contract its claims deposit and surplus loan monies from Park Avenue.

### b. PDS Changed Its Position To Its Detriment In Entering Into Subsequent Contracts With Park Avenue Directly For Workers' Compensation Insurance Starting In 2005.

In 2005, PDS entered into a contract with Park Avenue under which Park Avenue provided PDS with workers' compensation insurance coverage directly, instead of through Park Avenue's agent, PACA.  Ex.20.  PDS entered into this direct relationship with Park Avenue based upon PDS's reasonable belief that there would be a seamless transfer of PDS's claims deposit and surplus loan monies from under PACA's account to under PDS's new account because (1) PACA was acting as an agent of Park Avenue and subject to its control under PACA's apparent authority, (2) PACA continued to represent throughout 2003 to 2004 that PACA had forwarded PDS's claims deposit and surplus loan monies to Park Avenue and (3) Park Avenue represented that it already held PDS's claims deposit and surplus loan monies, received from its agent PACA.

PDS relied on the apparent authority of PACA to act as an agent for Park Avenue in contracting directly with Park Avenue because PDS reasonably believed it would be a

seamless transition to contracting directly with Park Avenue since its agent PACA had

already supplied Park Avenue with PDS's claims deposit and surplus loan monies, and

PDS would not have to take onerous actions to transfer or recoup its claims deposit and

surplus loan monies PACA forwarded to Park Avenue.  PACA represented in 2003 that

PACA had forwarded PDS's claims deposit and surplus loan monies to Park Avenue.

Ex.7.  There was no reason for PDS to believe PACA would not continue to act under its

apparent authority as an agent for Park Avenue and subject to Park Avenue's control.

Further, after learning of the new direct contract for workers' compensation insurance

coverage between PDS and Park Avenue, PACA continued to indicate that it would assist

in the transfer of PDS' claims deposit and surplus loan monies.  Ex.22.

With regards to the surplus loan monies, in Park Avenue's November 23, 2004

proposal to PDS, Park Avenue stated:

> The Surplus payment will be considered paid as long as
> Simple HR has the $823,903.00 with SkilStaf.  If SkilStaf
> pays the $823,903.00 to Simple HR, Simple HR must pay the
> funds to Providence Holding, Inc.  If SkilStaf will assign a
> Note for $823,903.00 to Simple HR, then Simple HR will
> assign the total amount to Providence Holdings, Inc.

Ex.20.  This proposal indicates on its face that PDS had $823,903.00 in surplus loan

monies with Park Avenue under PACA's account and two ways that the surplus loan

monies could be formally transferred to PHI to serve as the surplus loan monies required

to write workers' compensation insurance coverage for PDS.  This Park Avenue

composed statement indicates the transfer of surplus loan monies to be a mere formality

and that its agent PACA will accomplish this transfer through one of two ways.  Park

Avenue mentions no other option if, e.g.- PACA were to not transfer the surplus loan monies from under its account with Park Avenue to PDS's account with Park Avenue. PDS reasonably concluded, given Park Avenue's indications to PDS that PACA acted as the agent of Park Avenue in matters related to the workers' compensation insurance coverage, that PACA would accomplish the transfer of the surplus loan monies in one of the two mentioned ways stated by its principal, Park Avenue, and that such a transfer was a mere formality.

PDS was injured when PACA failed to accomplish this transfer of the surplus loan monies because PDS never had an opportunity to enter into its own direct surplus loan agreement with PHI, as contemplated by the proposal from Park Avenue to PDS. PACA already represented to PDS, in the Surplus Loan Agreement, that the surplus loan monies were being paid to Park Avenue, not PHI. PDS, informed only by the Park Avenue statement, was deprived of the chance to raise questions and investigate its own surplus loan agreement, or the mechanics of a note with PHI. If otherwise informed, PDS could have declined the PACA surplus loan arrangement, and sought relief earlier from either PACA or PHI, before PHI converted the surplus loan monies to paid-in-capital for Park Avenue.

In regards to claims deposits, in Park Avenue's November 23, 2004 proposal to PDS, Park Avenue stated:

> If Simple HR's claims payable through SkilStaf's policy are transferred to the Providence Property & Casualty Insurance Company Simple HR policy (along with Claims Collateral), the excess amount, if any, will be used to satisfy Simple HR' s Claims Collateral with Providence Property & Casualty

> Insurance Company.  Based on the attached Trend Costs
> Schedule, it appears the Total Trend Cost is $275,713.  Based
> on this Assumption, there is more than adequate collateral
> being held by SkilStaf.

Ex. 20.  This proposal indicates on its face that PDS had "adequate [claims] collateral" with Park Avenue under PACA's account.[2]  Park Avenue's statement indicates this transfer of claims collateral to be a mere formality. Otherwise, PDS and Park Avenue would not have included PACA transferring these funds as part of the agreement for direct workers' compensation insurance coverage for PDS.  Again, there is no alternative indicated if PACA did not transfer the claims collateral from under its account with Park Avenue to PDS's account with Park Avenue.  Therefore, PDS reasonably concluded, given Park Avenue's indications to PDS that PACA acted as Park Avenue's agent in matters related to the workers' compensation insurance coverage of PDS, that PACA would accomplish the transfer of the claims collateral on Park Avenue books and that such a transfer was a mere formality.

In subsequent proposals, Park Avenue effectively told PDS the transfer had been accomplished.  When proposing a renewal in 2005 (for 2006) Park Avenue told PDS that Park Avenue held $628,205 in claims collateral.  In 2006, when proposing a renewal for 2007, Park Avenue told PDS that it held $628,000 in claims collateral under the PACA program which applied for all five years of PDS's coverage, and that the initially required capital surplus contributions of 35% of manual premium would be paid back.

---

[2] Although this provision does not represent the exact amount of PDS's claims collateral with Park Avenue under PACA's account, it does demonstrate Park Avenue believed PDS had enough claims collateral under PACA's account to satisfy $275,773 in trend costs and still have enough leftover to satisfy Park Avenue's claims collateral requirements.  Moreover, the exact amount of PDS's claims collateral with Park Avenue under PACA's account was subsequently determined to be $623,502.26.

Therefore, PDS relied to its detriment on the apparent authority of PACA to act as the agent of Park Avenue when PDS decided to enter into this direct contractual relationship with Park Avenue because (1) the agency relationship between Park Avenue and PACA did not facilitate a seamless transition to a direct contractual relationship with Park Avenue, as PACA and Park Avenue attempted to require PDS to take further action to transfer or recoup its claims deposit and surplus loan monies rather than the mere formality Park Avenue and PACA indicated to PDS, (2) PDS's surplus loan monies remained with PHI, despite PACA's indications in the Surplus Loan Agreement that Park Avenue would receive PDS's surplus loan monies, and despite Park Avenue's indications it had received the money, without opportunity for PDS to make other arrangements, and (3) PDS is now unable to gain the benefit of its claims deposit and surplus loan monies from Park Avenue.

Accordingly, the Court should find PDS relied on the manifestations from Park Avenue that PACA had the apparent authority to act as its agent in matters related to the workers' compensation insurance coverage of PDS, and PDS changed its position, to its detriment, by entering into contracts with PACA, on behalf and for the benefit of Park Avenue, and by entering into a contract with Park Avenue under which Park Avenue provided PDS with workers' compensation insurance coverage directly.

### C. Oklahoma Statutes Require An Agency Relationship Between Park Avenue And PACA.[3]

Oklahoma statutes require the creation of an agency relationship between PACA and Park Avenue.  Okla. Stat. tit. 36, § 1435.2(7) provides:

> Any person not duly licensed as an insurance producer, surplus lines insurance broker, or limited lines producer who solicits[4] a policy of insurance on behalf of an insurer shall be deemed to be acting as an insurance agent within the meaning of the Oklahoma Producer Licensing Act, … <u>and the company by issuing the policy of insurance shall thereby accept and acknowledge the person as its agent in the transaction.</u>

Okla. Stat. tit. 36, § 1435.2(7) (2013) (emphasis added).  Okla. Stat. tit. 36, § 1435.2(7) creates an agency relationship if an insurer issues a policy of insurance that was solicited on its behalf by an unlicensed person.  Clearly there is an agency relationship created if an insurer issues a policy of insurance that was solicited on its behalf by its own licensed agent.  However, even an unlicensed insurance broker soliciting insurance on behalf of an insurer must be considered the agent of the insurer.  *Messick v. Johnson*, 1931 OK 736, 8 P.2d 28, 30; *Luther & Sons, Inc. v. Cmty. Nat. Life Ins. Co.*, 307 F.Supp. 93, 97 (N.D.

---

[3] Oklahoma law is applicable to Park Avenue and its agents because Park Avenue is an Oklahoma corporation and its dealings are subject to the laws of Oklahoma.  However, even if the Court decides Florida law to be applicable because the insurance at issue was sold to be used in Florida, Florida law still requires the creation of an agency relationship between Park Avenue and PACA.  Therefore, PDS will address this argument under Florida law in the next subsection.

[4] " 'Solicit' means attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company."  Okla. Stat. tit. 36, § 1435.2(18).

Okla. 1969) ("[W]here a person applies to an insurance broker for an insurance policy and the latter offers business to an insurance company which accepts it and issues a policy, it is not an unjustifiable inference that the broker is the insurer's agent in respect to further transactions pertinent to the policy."). Thus, if an insurer issues a policy of insurance that was solicited on its behalf by <u>any person</u>,[5] Oklahoma law requires the insurer to "accept and acknowledge the person as its agent in the transaction." Okla. Stat. tit. 36, § 1435.2(7) (2013); *see Shanks v. Travelers' Ins. Co.*, 25 F. Supp. 740, 744 (N.D. Okla. 1938) (determining predecessor statute to require an agency relationship created between employer and insurer where employer solicited, procured, and maintained policy of insurance on insurer's behalf by only making available to employees one master group life insurance policy for which employer passed on premiums to insurer through deducting premium amounts from employee's wages).

PACA solicited workers' compensation insurance coverage from PEOs, including PDS, on behalf of Park Avenue.[6] Park Avenue issued a policy of insurance for the workers' compensation insurance coverage of PDS, solicited by PACA on Park Avenue's behalf. Therefore, Oklahoma statutes require the creation of an agency relationship between PACA and Park Avenue. *See* Okla. Stat. tit. 36, § 1435.2(7) (2013).

Accordingly, the Court must find the creation of an agency relationship between PACA and Park Avenue for the policy issued by Park Avenue for the workers'

---

[5] Regardless of whether this premise applies to <u>any person</u>, Okla. Stat. tit. 36, § 1435.2(7) specifically applies to PACA because PACA is not a licensed insurance agent for workers' compensation insurance.
[6] PACA clearly acted on behalf of Park Avenue because PACA only offered workers' compensation insurance coverage through Park Avenue and could only write workers' compensation insurance coverage that would be profitable to Park Avenue.

28

compensation insurance coverage of PDS, which was solicited, procured, and maintained by PACA on behalf and for the benefit of Park Avenue.

### D.  Florida Law Makes PACA An Agent of Park Avenue

Florida statutes establish an agency relationship between PACA and Park Avenue.

Fla. Stat. § 626.7315 provides:

> With respect to any line of authority as defined in s. 626.015(5), no individual shall, unless licensed as a general lines agent:[7]
> (1) Solicit insurance or procure applications therefor; …
> (5) In any way, directly or indirectly, make or cause to be made, or attempt to make or cause to be made, any contract of insurance for or on account of any insurer.

Fla. Stat. § 626.7315 (2013).  Thus, soliciting or causing to be made an insurance contract on behalf of an insurer requires one to be a licensed insurance agent. Any person conducting such actions is acting in the capacity of a licensed insurance agent, albeit unlicensed, and must be subject to the same rules applied to licensed insurance agents. Fla. Stat. § 626.7315 (2013).

A licensed insurance agent must be either an insurance broker or an insurance agent.[8]  *See Essex Ins. Co. v. Zota*, 985 So.2d 1036, 1047 (Fla. 2008); *Almerico v. RLI Ins. Co.,* 716 So.2d 774, 776 (Fla. 1998).  Generally, an insurance broker acts on behalf of the insured, and an insurance agent acts on behalf of the insurer under agreement with that insurer  *See Essex*, 985 So.2d at 1047; *Almerico,* 716 So.2d at 776; 3 Couch on Ins. §

---

[7] "General lines agent" includes those transacting workers' compensation insurance.  *See* Fla. Stat. § 626.015 (2013).  ("(5) 'General lines agent' means an agent transacting any one or more of the following kinds of insurance: (a) Property insurance. (b) Casualty insurance, including commercial liability insurance underwritten by a risk retention group, a commercial self-insurance fund as defined in s. 624.462, or a workers' compensation self-insurance fund established pursuant to s. 624.4621.")

[8] These are the only two types of relationships under which a person may sell insurance, other than actually being the insurer.  PACA is not an insurance company.

45:5.  However, <u>any person</u>, including insurance brokers, are agents of insurer, just as if

insurer had appointed or authorized that person to act on its behalf, where the insurer

"accepts from or writes any insurance business" for such person.  Fla. Stat. § 626.342

(2013); *Essex*, 985 So.2d at 1047; *Almerico,* 716 So.2d at 776; *Brown v. Inter-Ocean Ins.*

*Co.*, 438 F.Supp. 951, 954 (N.D. Ga 1977) (applying Florida law); *Russell v. Eckert*, 195

So.2d 617, 620 (Fla. 2d DCA 1967).  Furthermore, "once the policy has been issued, the

relationship between the insured and the broker is severed" and the broker acts only on

behalf of the insurer in any further transactions pertinent to the insurance coverage.

*Graham v. Lloyd's Underwriters at London*, 964 So.2d 269, 275 (Fla. 2d DCA 2007).

Therefore, after the policy is issued, <u>any person</u> that solicited or caused to be made an

insurance contract on behalf of an insurer is recognized as an agent of the insurer under

Florida statutes.  Fla. Stat. § 626.7315 (2013); Fla. Stat. § 626.342 (2013).

PACA solicited workers' compensation insurance coverage from PEOs, including

PDS, on behalf of Park Avenue.[9]  Park Avenue then issued a policy of insurance for the

workers' compensation insurance coverage of PDS which was solicited by PACA on

Park Avenue's behalf.  Therefore, under Florida law, PACA is an agent of Park Avenue.

*See* Fla. Stat. § 626.7315 (2013); Fla. Stat. § 626.342 (2013).

Accordingly, the Court must find the creation of an agency relationship between

PACA and Park Avenue for the policies issued by Park Avenue for the workers'

---

[9] PACA clearly acted on behalf of Park Avenue because PACA only offered workers' compensation insurance coverage through Park Avenue and could only write workers' compensation insurance coverage that would be profitable to Park Avenue.

compensation insurance coverage of PDS, which was solicited, procured, and maintained by PACA on Park Avenue's behalf.

### IV. The Receiver Must Recognize PDS's Claims Deposits And Surplus Loan Monies Held By Park Avenue, Submitted Through Park Avenue's Agent, PACA, And Apply Such Monies As An Offset Against PDS's Liabilities.

The agreements between PACA and PDS constitute agreements between PDS and Park Avenue because PACA acted for Park Avenue in entering into all agreements with PDS. Thus, mutual debts between PACA and PDS under these agreements are also mutual debts between Park Avenue and PDS, and the Receiver must allow PDS to offset such mutual debts against its liabilities to Park Avenue.

"[A]n agreement made with a known agent for a disclosed principal is a contract with the principal alone." *Shebester v. Triple Crown Insurers*, 1992 OK 20, 826 P.2d 603, 609. "The very same rule applies to insurance contracts." *Id.* "The general rule is that knowledge of an agent obtained within the scope of his authority is ordinarily imputed to his principal." *Bailey v. Gulf Ins. Co.*, 389 F.2d 889, 891 (10th Cir. 1968) (quoting *Motors Ins. Corp. v. Freeman*, Okl., 304 P.2d 328, 330). "Conduct falls within an agent's scope of authority if the agent has actual or apparent authorization to take a specific act on the principal's behalf." *Clark v. Brien*, 59 F.3d 1082, 1087 (10th Cir. 1995). "An act is also deemed within an agent's scope of authority if it is within the scope of his employment and taken in furtherance of the principal's business." *Clark*, 59 F.3d at 1087 (citing *Tulsa General Drivers Union v. Conley,* 288 P.2d 750, 754 (Okla.1955) (per curiam)).

Furthermore, Park Avenue ratified the acts of PACA in procuring insurance coverage for PDS.  "A principal may still be held liable for an act that is beyond the scope of an agent's authority if the principal ratifies the act."  *Clark*, 59 F.3d at 1087 (citing *Urabazo v. Humpty Dumpty Supermarkets,* 463 P.2d 352, 354 (Okla. Ct. App. 1969).  "For ratification to be valid, it must be done with knowledge of the material facts."  *Clark*, 59 F.3d at 1087; *see also Beard v. Herndon,* 84 Okla. 142, 203 P. 226, 229 (1921) (" 'A ratification in express terms and with knowledge of the facts of what an agent has done is, of course, equivalent to a prior authority.' ") (quoting 31 Cyc. 1262, 1263); *Mason v. Nibel,* 129 Okla. 7, 263 P. 121, 122 (1928) (per curiam) ("[T]he master is not bound unless he ratifies the unauthorized acts of the servant ... with knowledge of what had been done by the servant....").

PACA was acting as an agent for its disclosed principal, Park Avenue, when PACA entered into the PACA Quatro, LLC Agreement and the Surplus Loan Agreement with PDS for the worker's compensation insurance coverage of PDS through Park Avenue.  In fact, PDS was already being covered under workers' compensation insurance provided through PACA's principal, Park Avenue, when PDS entered into the PACA Quatro, LLC Agreement and the Surplus Loan Agreement.  Ex.10.  Thus, PDS reasonably believed it was ultimately entering into these contracts with Park Avenue through its agent, PACA.

Further, PACA was acting within the scope of PACA's actual and apparent authority as an agent of Park Avenue when PACA entered into the PACA Quatro, LLC Agreement and the Surplus Loan Agreement with PDS.  *See supra*, Part III.  Both of

these contracts were in furtherance of Park Avenue's business of providing PEOs with

workers' compensation insurance coverage through its agent, PACA.  *Id.*

Moreover, Park Avenue clearly ratified the PACA Quatro, LLC Agreement and

the Surplus Loan Agreement between PACA and PDS, for the benefit of Park Avenue.

Indeed, Park Avenue continued to represent that Park Avenue had received PDS's claims

deposit and surplus loan monies under these two agreements from its agent PACA.  Park

Avenue's 2005 proposal to PDS stated, "We currently hold $628,502 in Claims

Collateral."  Ex.26.  In a December 11, 2006 email to PDS, Park Avenue stated,

> [W]e hold $628,000 in claims collateral (this amount is really
> held under Skilstaf/PACA program).  This claims collateral
> applies for all 5 years of SimpleHr's program. … Surplus – as
> discussed this was initially required as 35% of manual in
> order to write your business.  A dividend of 3% is paid on this
> money to Skilstaf/PACA.  As noted in our meeting these
> funds will be paid back once the trigger mechanism is met
> and the State of Oklahoma allows.

Ex.27.  Additionally, Park Avenue communicated internally several times that Park

Avenue held PDS's claims deposit and surplus loan monies.  Ex.28 (Park Avenue chart

stating SimpleHR has $1,194,213.28 in collateral); Ex.29 (Park Avenue references PDS's

total collateral stating, "Simple has about 1.6 under Skilstaf."). Park Avenue not only

knew that PACA entered into these two agreements in furtherance of the workers'

compensation insurance coverage for PDS, Park Avenue required PACA to obtain these

two agreements with PDS.  *See supra*, Part III.  Thus, even if Park Avenue could

maintain these agreements were outside the scope of PACA's authority as its agent, Park

Avenue ratified both agreements through knowledge of all material facts relating to the two agreements.

Therefore, the PACA Agreement and the Surplus Loan Agreement between PACA and PDS, and the material items and obligations contained therein, must be imputed to Park Avenue. Accordingly, Park Avenue must credit to PDS its claims deposit monies, in the amount of $623,502.26, and PDS's surplus loan monies, in the amount of $832,903.20, paid to Park Avenue, through PACA.

## V. Crediting PDS With The Claims Collateral And Surplus Loan Funds Paid To Park Avenue Supports Summary Judgment On Counts I And III

PDS paid the claims collateral and capital surplus to PACA, Park Avenue's agent, which paid those funds to Park Avenue. As of 2005, Park Avenue had received $1,461,405.46 from PDS. Neither Park Avenue nor PACA ever repaid those funds to PDS. As of the conclusion of the relationship, in December 2007, PDS's account at Park Avenue should have reflected those funds. Park Avenue's refusal to credit those funds to PDS contravenes the statements Park Avenue made to PDS about how collateral funds would be handled.

The Receiver claims that PDS owed the following funds: $902 for 2005 (Petition ¶23), $699,772 for 2006 (Petition ¶ 29) and $1,423,338 for 2007 (Petition ¶35). Other credits are pending against those amounts, according to the Assistant Receiver, due to application of case reserves and other reductions in incurred claims. Regardless, these claims fail to reflect the credit due PDS of at least $1,461,405.46, which offsets an amount equal to at least two of the three claims asserted. Amounts due as offset should be

applied to the claimed damages to determine whether a claim remains. Absent damages, no claim for breach of contract remains.

To prove breach of contract under Oklahoma law, the Receiver must demonstrate the formation of a contract, a failure to perform, and resulting damages. *Digital Design Group, Inc. v. Information Builders, Inc.,* 2001 OK 21, ¶ 33, 24 P.3d 834, 843; See OUJI 23.1. The Receiver, applying the credit due PDS for the payments Park Avenue agreed PDS had made to Park Avenue, has no damages (assuming the initially claimed amounts) for 2007 and 2005, and the damages for 2006 are substantially reduced. Absent damages, the Receiver has no claim for interest, attorneys or other fees and costs. Therefore, Summary Judgment is appropriate for Counts I and III of Plaintiff's Petition.

## VI.    Undisputed Facts Show An Equitable Accounting Due

In its counterclaim PDS asks for an equitable accounting. An "equitable accounting" is a "proceeding to adjust mutual accounts and strike a balance." *See Whitehorse v. Johnson,* 156 P.3d 41, 45 (Okla. 2007) (citations omitted). A claimant must prove: (1) a confidential or fiduciary relationship; (2) the defendant had control over another's property and records concerning the property; (3) after a demand for an accounting, defendant did not account for or return the property; and (4) there is no adequate remedy at law. *Howell Petroleum Corp. v. Leben Oil Corp.,* 976 F.2d 614, 620 (10th Cir. 1992) An action for a common law accounting "contemplates a full and complete investigation of the mutual acts of the parties and the striking of a balance and rendition of judgment in favor of the party entitled thereto." *Mills v. Mills,* 512 P.2d 143, 149–50 (Okla. 1973).

Here the Receiver acknowledges his fiduciary relationship with PDS as a Park Avenue policyholder.  There is no dispute that Park Avenue acknowledged receipt of funds paid by PDS to Park Avenue's agent, PACA, for claims collateral and a capital surplus loan, and that the Receiver holds those and other records of Park Avenue.  In 2010 PDS demanded that the Receiver acknowledge and credit the claims collateral and capital surplus loan funds against amounts due Park Avenue from PDS.  The Receiver has neither accounted for or returned those funds and, instead, initiated this action.  An equitable accounting should occur when the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them. *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 964-65 (10th Cir. 2009) (citation omitted).  This action, and this Court's equitable authority, represent the remedy for resolution of this complex dispute.  Therefore this Court should grant PDS an equitable accounting crediting the claims collateral funds and capital surplus loans fund paid Park Avenue's agent against any funds due from PDS to Park Avenue.

**CONCLUSION**

The undisputed material facts demonstrate PACA acted as Park Avenue's agent when soliciting, procuring, and maintaining workers' compensation insurance for PDS.  Park Avenue granted, and PACA accepted, authority to act as Park Avenue's agent. Park Avenue represented the relationship to PDS and other PEOs and controlled PACA's activities addressing workers' compensation insurance coverage.  In actions and appearances, PACA performed as Park Avenue's agent.  PDS relied upon Park Avenue's and PACA's relationship when it entered into agreements to obtain and maintain

workers' compensation insurance coverage from Park Avenue.  Oklahoma law, and

Florida law, recognize and confirm this principal-agent relationship.  As PACA was Park

Avenue's agent, PDS's payments to PACA, for claims collateral and capital surplus,

represented payments to Park Avenue.  The Receiver must credit such payments against

any amounts due from PDS.  The Receiver, in his fiduciary capacity, failed to do so after

demand from PDS. An equitable accounting should now Order the Receiver to do so.


Respectfully Submitted

*/s/ Robert C. Byerts*
Robert C. Byerts
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee FL  32308
850.878.6404
850.942.4869 Fax
rbyerts@dealerlawyer.com

Kenneth A. Tillotson, OBA No. 19237
Phillips Murrah P.C.
Corporate Tower, Thirteenth Floor
101 N. Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-4100
Facsimile: (405) 235-4133
E-mail: katillotson@phillipsmurrah.com

Attorneys for Defendant, Pyramid Diversified
Services, Inc.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of September, 2013, I electronically filed the foregoing with the Clerk of the Court using the ECF system.  Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF Registrants:

| | |
|---|---|
| Keith A. Wilkes, Esquire | kwilkes@newtonoconnor.com |
| William W. O'Connor, Esquire | BOConnor@newtonoconnor.com |
| Gregory P. Reilly, Esquire | greilly@newtonoconnor.com |
| John Michael O'Connor | joconnor@newtonoconnor.com |
| Patrick H Kernan | pkernan@newtonoconnor.com, |

**Attorneys for the Defendant/Plaintiff**

_/s/ Robert C. Byerts_
Robert C. Byerts