## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PYRAMID DIVERSIFIED SERVICES, INC. d/b/a SIMPLE HR, | ) ) ) | |
| Plaintiff, | ) | NO. CIV-09-622-HE |
| vs. | ) ) | |
| PROVIDENCE PROPERTY & CASUALTY INSURANCE, ET AL., | ) ) ) | |
| Defendants. | ) ) | |
| STATE OF OKLAHOMA ex rel. JOHN DOAK INSURANCE COMMISSIONER. AS RECEIVER FOR PARK AVENUE PROPERTY & CASUALTY INSURANCE COMPANY, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | NO. CIV-12-0457-HE |
| vs. | ) ) | |
| PYRAMID DIVERSIFIED SERVICES, INC., | ) ) ) | |
| Defendant. | ) ) | |

## ORDER

These two cases involve disputes between various professional employer organizations and the insurance company which provided worker's compensation insurance coverage to them and which is now in receivership. A third party complaint filed in No. CIV-09-622 has been resolved, leaving claims and counterclaims asserted by Pyramid Diversified Services, Inc. d/b/a Simple HR ("PDS"), the State of Oklahoma, *ex rel*., John Doak, Insurance Commissioner, as Receiver for Park Avenue Property and Casualty

Insurance Company ("Receiver"),[1] PACA, Inc. and Skilstaf.[2] Motions for summary judgment have been filed in both cases, the Receiver has filed a motion to amend to add a new defendant and PDS has moved to exclude testimony from the Receiver's expert witness. All pending motion will be addressed in this order.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" Carter v. Pathfinder Energy Services, Inc., 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting Zwygart v. Bd. of Cnty. Comm'rs, 483 F.3d 1086, 1090 (10th Cir.2007)).[3]

Background[4]

---

[1]Providence Property & Casualty Insurance Company was originally named as a defendant. That company was sold by Providence Holdings, Inc, its sole shareholder, to Park Avenue Insurance, LLC on January 30, 2009, and was renamed Park Avenue Property & Casualty Insurance Company.

[2]The State of Oklahoma filed suit as Receiver for Park Avenue Property & Casualty Insurance Company and Park Avenue Casualty and Indemnity Company, but there have been no further references to the latter entity.

[3]Page references for briefs and exhibits are to the CM/ECF document and page number and sometimes the document or deposition page number. For example, deposition page no. 67 of Exhibit 2 to PDS's motion for summary judgment is referred to as Doc. #63-2, p. 2, depo. p. 67.

[4]The court has disregarded one of PDS's exhibits, Doc. #63-4. It is unclear from the document itself, and PDS has not identified, who wrote it, to whom it was sent or when it was written. PDS merely states that Exhibit 4 is a "true and correct cop[y]" of a document "produced by PACA, Inc. in the related litigation." Doc. #63-31, p. 3. There are other problems with some of PDS's exhibits. PDS cites pages and paragraphs from "W.S.," but does not identify "W.S." Doc.

2

PDS,[5] PACA and Skilstaf[6] are "professional employer organizations" ("PEOs"). A PEO generally contracts with small to medium size businesses for the purpose of providing various employment-related services, including obtaining workers' compensation insurance for the client's workforce.[7] PACA initially obtained worker's compensation coverage from Park Avenue Property & Casualty Insurance Company ("Park Avenue"), f/k/a Providence Property and Casualty Insurance Company ("PPC"),[8] an Oklahoma-based insurer, solely for its clients' employees. Then, beginning in 2002, PACA began to provide other PEOs with workers' compensation coverage from Park Avenue under the "PACA Program." PACA marketed the coverage and found participants for the program, who were referred to as sub-insureds. The policies covering the participating PEOs' employees were issued in PACA's

---

#63, p. 6, ¶4. The court assumes PDS is referring to Wayne Stark and its Exhibit 1, but notes that the deponent is not identified in that deposition excerpt. PDS also cites to the deposition testimony of Mark Tharp, without identifying the exhibit number. Id.

[5]PDS or "Simple HR" is a Florida corporation. Bill Lindsley is its vice-president.

[6]Skilstaf, Inc. is the parent company of PACA. It owns 100% of PACA and Wayne Stark owns the holding company that owns Skilstaf. Although PACA/Skilstaf contracted with Park Avenue for the provision of workers' compensation insurance, the court will refer in this order just to "PACA." Wallis Haynes was an attorney for PACA/Skilstaf.

[7]As explained by the Oklahoma Legislature, "professional employer organizations provide a valuable service to commerce and the citizens of this state by increasing the opportunities of employers to develop cost-effective methods of satisfying their personnel requirements and providing employees with access to certain employment benefits which might otherwise not be available to them." 40 Okla. Stat. § 600.1

[8]Derek Lancaster was president of Park Avenue, Jerry Lancaster was its marketing director and Steve Goper was director of underwriting.

3

name.[9]  Park Avenue required PACA to remit the premium payments, state assessments, and loss adjusting expenses for the sub-insureds' insurance coverage, along with claims deposits to serve as reserves for the PEOs' open workers' compensation claims and capital surplus loans mandated by state law.  Park Avenue also required PACA to disclose all pertinent information about the PEOs, together with the rest of PACA's clients, including data related to each employee to be covered, pursuant to underwriting guidelines.  It set the underwriting requirements applicable to all PACA's clients and retained final approval on all new business submitted by PACA that would be covered by the Park Avenue policies issued to PACA.

The manual premiums Park Avenue charged PACA were calculated based on the payroll of all employees covered by the policies issued to PACA without regard to the particular client to which the premium was attributable.  PACA then set the premium rates it charged the sub-insureds. *See* Doc. #63-1, p 65 (Stark depo.).  PDS was one of the PEOs for which PACA obtained and maintained workers' compensation insurance coverage from Park Avenue.

PACA's relationship with PDS is set out in the PACA Quatro, LLC operating agreement.  Park Avenue was not a party to, or even referenced in, that agreement.  Pursuant to the operating agreement, PACA charged PDS a negotiated premium rate and PACA

---

[9] *PDS asserts that Park Avenue "set the terms and conditions of the workers' compensation insurance coverage provided to the PEOs through PACA, such as coverage limits, claims approval, deductibles, and underwriting requirements."  Doc. #63, p. 7, ¶ 11.  However, the terms of the policy Park Avenue issued PACA were, as is sometimes the case and as one of PDS's own exhibits demonstrates, the result of negotiations between Park Avenue and PACA.  See Doc. No. 63-8.*

agreed to reimburse PACA for the claims of its employees up to the per-claim deductible.[10] The policy Park Avenue issued PACA in 2003 covered PDS and Park Avenue had some direct communication with PDS regarding its workers' compensation coverage. The premiums PDS paid PACA were higher than what Park Avenue charged PACA. In conjunction with its participation in the PACA program, PDS executed a surplus loan agreement. There is evidence Park Avenue promised PACA a profit sharing arrangement, but it never materialized.

In 2003 and 2004, PDS transferred $628,205.26 in claims collateral to PACA[11] and PACA transferred $2,000,019.50 in claims collateral to Park Avenue. PDS claims those transfers were funded, at least in part, by claims collateral payments from PEOs, including PDS. In 2003 and 2004, PDS also executed a surplus loan agreement with PACA and transferred $823,903.20 in surplus loan monies to PACA. PACA transferred $3,100,000 in surplus loan monies to Park Avenue's owner, Providence Holding, Inc. ("PHI") and PHI

---

[10]While the PACA Quatro agreement stated that the per claim deductible was $25,000, PDS has offered evidence that that was a mistake and that the deductible actually was $250,000. The Receiver argued that because the deductible that PACA charged was lower than what it paid, its potential profit was uncertain so its receipt of the difference in premium payments could not be considered a commission. The Receiver's argument is not persuasive, as it appears to be based on erroneous information about the size of the deductible. However, PDS's argument that PACA received a commission is similarly unconvincing. Stark testified that PACA was ultimately liable for the sub-insureds' claims and that it received about 10 percent of the premiums as compensation for assuming that risk. PDS has offered no authority for its assertion that the compensation in those circumstances could be considered a "commission."

[11]The PACA Quatro Agreement required PDS to make a "refundable claims deposit" equal to 100% of the estimated first month's premium. It also provided for repayment of the claims deposition to the extent "the deposit balance [was] in excess of the reserve requirement for the open claims and within the deductible amount set by the Agreement." Doc. #61-16, p. 30.

then loaned the money to Park Avenue. The court previously held that PHI is liable to PACA for the monies loaned and the Tenth Circuit has affirmed that decision. PDS is entitled to $823,903 from that judgment.

In 2004 PDS decided to obtain coverage for the next year (2005) directly from Park Avenue rather than through PACA. On November 23, 2004, Park Avenue submitted a proposal to PDS outlining the terms pursuant to which Park Avenue would provide PDS with workers' compensation insurance. The proposal required PDS to provide surplus loans to PHI and claims collateral to Park Avenue. As shown by the following excerpt from the proposal, Park Avenue deemed those requirements satisfied as long as PDS maintained $823,903, plus claims collateral, with PACA.[12]

> Surplus: Simple HR agrees to loan 17.5% of [sic] Manual Premium Providence Holdings, Inc., owner of Providence Property & Casualty Insurance Company, as a Surplus Note or purchase Preferred Stock issued by Providence Holdings, Inc.
>
> The Surplus payment will be considered paid as long as Simple HR has the $823,903.00 with Skilstaf. If Skilstaf pays the $823,903.00 to Simple HR, Simple HR must pay the funds to Providence Holdings, Inc. If Skilstaf will assign a Note for $823,903.00 to Simple HR, then Simple HR will assign the total amount to Providence Holdings, Inc.
>
> Claims Collateral: The Claims Collateral will be $250,000.00 with $50,000 Payable at closing and $50,000 payable per month until the $250,000 is paid.

---

[12]*In connection with their discussions, PDS informed Park Avenue that "[o]ur cash on deposit with PACA/Skilstaf is as follows: $823,903.20 – Capital Reserve Deposit" and "$628,502.26 – Claims Deposit." Doc. #68-16. On December 30, 2004, PACA confirmed the amount of claims deposit PDS had previously paid it, which covered some claims outside of the policies Park Avenue issued PACA. Doc. #63-22.*

> If Simple HR's claims payable through SkilStaf's policy are transferred to the Providence Property & Casualty Insurance Company Simple HR policy (along with Claims Collateral), the excess amount, if any, will be used to satisfy Simple HR's Claims Collateral with Providence Property & Casualty Insurance Company. Based on the attached Trend Costs Schedule, it appears the Total Trend Cost is $275,773. Based on this assumption, there is more than adequate collateral being held by Skilstaf.

Doc. #61-5.

PDS agreed to the proposal, signing it on November 23, 2004, and Park Avenue issued a policy insuring PDS for 2005.[13]

On November 29, 2004, PDS wrote PACA, notifying it that PDS was withdrawing from PACA Quatro LLC as of January 1, 2005, and "requesting termination of workers' compensation coverage under the policy issued to PACA, Inc.," effective January 1, 2005. Doc. #61-18. In that letter PDS asked PACA for a portfolio transfer, which would assign liability for all claims attributable to PDS employees from the policies issued to PACA for 2003 and 2004, to a new policy that Park Avenue would issue to PDS. PDS also asked "that all monies paid as a claims deposit ($628,502.26) be transferred from PACA's policy to the new policy issued," *id.*, to satisfy PDS's claims collateral obligation to Park Avenue, and that PACA assign its $823,903 surplus loan with PDS.[14]

Though PDS represented to Park Avenue on January 18, 2005, that an agreement in

_____

[13]*The parties agree that the PDS-Park Avenue insurance contracts for 2005-2007 are governed by Oklahoma law.*

[14]*The requested transfer would not have involved the physical transfer of the money, but would have been a transfer on the books of Park Avenue from PACA's account to an account for PDS.*

principle had been reached for the transfer, PACA never executed a document reflecting the agreement. In his January 18 letter to Park Avenue discussing the transfer agreement, Lindsley (PDS) stated: "[p]er my conversation with you on Thursday January 13, 2005, please instruct your attorney to draft the necessary documents to finalize this transaction." Doc. #80-23. Park Avenue prepared a draft Assumption and Transfer Agreement and sent it to PACA in October 2005, Doc. #80-31,[15] but PACA never executed it. Wayne Stark testified that "it [the assignment] never happened." Doc. #61-15, depo. p. 126. He stated that he "never agreed to a portfolio transfer." *Id.*

In its December 14, 2005, proposal to renew PDS's workers compensation coverage for 2006, Park Avenue stated that it "currently [held] $628,205 in Claims Collateral." Doc. #63-26.[16] That proposal did not mention surplus loan requirements. About a week earlier, on December 8, 2005, PACA indicated in response to an email from Lindsley (PDS) that "in general terms there [was a transfer] agreement," but that it thought that two other PACA clients should be given the same option as PDS and, "[i]f that [was] agreeable," then PACA

---

[15]*The document was sent by John Ratzel, attorney for Park Avenue, to Wallis Haynes, attorney for PACA, with a cc to Bill Lindsley. Doc. #80-30.*

[16]*The agreement stated with respect to claims collateral:*
*Claims Collateral*
*You will maintain Claims Collateral on deposit with Us equal to 25% of the Manual Premium as in effect from time to time. Currently, the required amount of Claims Collateral is $875,000 based on a current estimated Manual Premium of $3,500,000 (the "Current Estimated Manual Premium Amount"). We currently hold $628,205 in Claims Collateral. At this time, we will not require any additional collateral.*
*Doc. #63-26.*

thought it was "prepared to move forward effective 1/1/06." Doc. #80-23.[17]  In December

2005, PACA told Park Avenue that it could deal directly with PDS for its 2003 and 2004

claims.[18]

In describing its proposal to renew PDS's workers compensation coverage for 2007,

Park Avenue stated that it held "$628,000 in claims collateral (this amount is really held

under Skilstaf/PACA program).  This claim collateral applies for all 5 years of SimpleHr's

program."  Doc. #63-27.  The proposal declared with respect to claims collateral:

> You will maintain Claims Collateral on deposit with Us equal to 25% of the
> Manual Premium as in effect from time to time. Currently, the required
> amount of the Claims Collateral is $700,000 based on a current estimated
> Manual Premium of $2,800,000 (the "Current Estimated Manual Premium
> Amount"). We will not request any additional Claims Collateral at this
> time.

Doc. #61-7.  The agreement did not mention surplus loan requirements.  Park Avenue did not

insure PDS after 2007.

The Receiver asserts that there could be no assignment of the claims portfolio, the

_____

[17]*In his email to Wallis Haynes with PACA/Skilstaf and John Ratzel with Park Avenue, Lindsley said: "Have we had any progress with this issue?  The terms of this issue were agreed to almost a year ago by Wayne [Stark], Jerry [Lancaster] and myself.  Please advise on the status of this issue so we can move on to bigger and better things."  Doc. #80-23.  Preceding emails indicate that Ratzel had sent Haynes a draft claims portfolio transfer agreement in October 14, 2005, with a copy to Lindsley, but Haynes had not take any action with respect to it.  Id.*

[18]*PDS's evidence substantiating this statement, which the Receiver did not challenge, is an email sent on December 14, 2005, to Park Avenue's claims department, in which a Julie Saucedo states that she "received a call from Wayne Stark at PACA and he advised that we may now deal directly with [PDS] on any authority levels or directives on claims and no longer need to run action plans by Brenda Harris. . . . I notified Bill Lindsley, President of [PDS], and he wanted to express his gratitude to the staff for such a close working relationship and that he is very excited about this change. We will continue to close out the 2003-2004 policy year claims."  Doc. #80-24.*

claims deposit and the surplus loan payment without PACA's agreement. While Lindsley testified that Wayne Stark/PACA had to approve the transfer, Doc. #80-3, pp. 5, 13, depo. pp. 60, 92, he also testified that he thought "[i]n practice and in principle he did do it." *Id.* at p. 60. He stated that the assignment "was never signed but it was observed in practice." *Id.* at p. 79.

PDS was aware in late 2007 that PACA had not transferred the claims deposit. *See* Doc. Nos. 68-17, 68-18. Park Avenue informed PDS in September 2007 that PACA still held the funds, Doc. Nos. 80-29, 80-32.[19] PDS continued, though, to take the position that Park Avenue held its claims deposit. Doc. # 80-33.

In December 2007 Park Avenue refunded $1 million in claims collateral to PACA in response to its request for a refund, but PACA did not allocate any part of that refund as being part of PDS's claims deposit which it had previously paid to PACA. By email dated December 18, 2007, PDS asked Park Avenue to "intervene on our behalf to have Wayne transfer all the outstanding claims deposit" excluding expected exposure on one claim. Doc. #68-17. In a letter dated January 3, 2008, Park Avenue claimed PDS owed it $624,488.96.

On November 19, 2008, PACA informed Park Avenue that "none of the $1 million claim collateral [could] be applied to any Simple HR claims for the 05, 06 and 07 years."

---

[19]*Derek Lancaster advised Bill Lindsley in an email dated September 11, 2007: "As you are aware, we do not hold any of your deposits. They are with PACA if my memory holds correct. I cannot recall the deal that was struck when you moved from PACA direct to PPC, but will review the file." Doc. #80-28. In an email he sent to Lindsley two weeks later he reiterated that Park Avenue "[did] not hold any deposit or collateral for [PDS] as PACA [was] still in possession of the funds." Doc. #80-31.*

Doc. #68-12. PACA claims it did allow PDS to apply part of the $628,205 to satisfy its obligations to PACA and, according to its accounting, only $237,808 remains.

On November 18, 2009, a state court placed Park Avenue into receivership. The Oklahoma Insurance Commissioner was appointed as Receiver for the insurer, pursuant to a consent order of liquidation. The Receiver acts as fiduciary for PDS and other Park Avenue policy holders. PDS has made a demand to the Receiver for an accounting and credit for funds it claims it paid Park Avenue.

On February 15, 2011, PACA assigned to PDS, out of its claims collateral account with Park Avenue, "up to the amount of $1,381,391.69" for PDS to use in "reconciling its own Park Avenue accounts with the Receiver." Doc. #68-19. The assignment provided that the parties agreed that it would be null and void if the Receive did not "acknowledge and accept this Assignment and apply it for the use and benefit of Assignee in the full amount of $1,381,391.69." *Id.* The Receiver did not accept or acknowledge the assignment.

The agreements between PDS and Park Avenue pursuant to which Park Avenue provided PDS with workers' compensation insurance for 2005-2007, required PDS to make periodic premium payments "on a self-reported basis calculated from the weekly payroll" of PDS's clients' employees." Doc. #61, p. 9. A premium audit was conducted at the end of each policy year to determine whether a premium deficiency or surplus existed. PDS paid all premiums that were due under the 2006 and 2006 agreements. The Receiver asserts that PDS owes an additional $23,338 for premiums for calendar year 2007. Bill Lindsley challenged that amount in this deposition testimony, stating that PDS was not afforded the

opportunity, as it had been in prior years, to address the audit with Park Avenue and adjust the numbers. While he stated he took issue with items 23-38 of the audit, he could not explain why they were inaccurate. Doc. #80, Exhibit 3, depo. pp. 110-111.

The agreements also required PDS to reimburse Park Avenue for certain benefits, including workers' compensation benefits, damages and allocated loss adjustment expense up the applicable deductible amount.[20] Park Avenue invoiced PDS monthly for amounts it had paid on workers' compensation claims that were within the per-claim deductible ("paid claims." "[C]umulative loss runs that showed the amounts 'incurred' for each claim, or amounts due for actual payments on claims and case reserves for open claims within the applicable deductible amount" were included with the invoices. Doc. #61, p. 10. PDS "does not dispute any of the insurer invoices or loss runs or amounts due to Park Avenue for 'incurred claims' (paid amounts and case reserves)," except for disputes regarding certain claims and alleged setoffs. *Id.*

Various guaranty associations are currently administering and paying certain open claims covered under the policies Park Avenue issued PDS. They set case reserves for the open claims, make payments and settle claims. Payments of $2,794.804.57, that are within the deductible amount, have been made on claims attributable to the 2005-2007 policies issued by Park Avenue to PDS. With a credit for an improper charge, the amount of paid claims totals $2,643,863.16. The guaranty associations of Mississippi and Florida have

---

[20]*The per claim deductible for the 2005 agreement was $250,000. For 2006 and 2007 it was $500,000.*

established case reserves totaling $409,492.65 for two open claims. Incurred but not reported reserves ("IBNR reserves") or "claims development reserves" for the 2005-2007 policy years is $115,703. The Receiver asserts that PDS has paid $1,359,326.28 for claims incurred during the 2005-2007 policy years and owes $1,809,733 for claims within the deductible. PDS disputes these amount on the basis that it paid $628,205.26 in claims deposits and $823,903.20 in surplus loan monies in 2003 and 2004 to PACA, Park Avenue's alleged agent.

The Receiver demanded payment from PDS for unpaid premiums and unreimbursed deductibles on July 8 and September 21, 2010. The 2006 and 2007 agreements provide that if payment is not received within ten days of the date of an invoice, PDS will be charged a monthly late fee of one and one half percent of the required payment for each subsequent month or any fraction of a month. The Receiver contends that PDS owes at least $987,147 in interest through September 4, 2013, calculated from ten days after it demanded payment from PDS in July and October 2010. PDS disputes that any interest is owed, based on monies it asserts it paid Park Avenue in prior years via PACA.[21]

There is considerable overlap in the remaining claims in the two lawsuits that have been filed. In Pyramid Diversified Servs., Inc. v. Providence Property, No. CIV-09-622-HE. PDS asserts against claims against Park Avenue for breach of contract, breach of the covenant of good faith, conversion, fraud in the inducement, common law fraud and breach

---

[21]*The court assumes this is the argument PDS is making in its response to the Receiver's Fact Nos. 23 and 24, Doc. #61, p.12.*

of a loan agreement. It also contends that Park Avenue violated Florida Statute § 517.301 and requests a declaratory judgment. PDS seeks declaratory relief from PACA and asserts a breach of contract claim against it based on the surplus loan agreement. The Receiver/Park Avenue has counterclaimed for breach of contract and requests a declaratory judgment.

In the State of Oklahoma v. Pyramid Diversified Servs., No. CIV-12-457-HE, the Receiver asserts three breach of contract claims against PDS based on the agreements between Park Avenue and PDS, pursuant to which Park Avenue provided PDS with workers' compensation insurance coverage from 2005-2007. PDS counterclaimed, asserting claims for breach of fiduciary duty, conversion, negligence, equitable accounting, and equitable trust. PDS claims Park Avenue has denied it the "benefit of either the $628,205 in claims collateral or the $823,903 capital surplus loan PDS tendered to Park Avenue through PACA." Doc. #63, p. 12. The Receiver responds that PDS paid those monies to PACA, not Park Avenue and PACA did not assign those funds to Park Avenue.

<u>Analysis</u>

<u>PDS and Receiver/Park Avenue's Motions for Summary Judgment</u>

PDS contends that PACA acted as Park Avenue's agent and, therefore, "Park Avenue is liable for PACA's actions concerning the worker's compensation insurance coverage for PDS." Doc. #63, p. 13. Relying on this asserted agency relationship, PDS claims that monies it paid PACA for claims deposits and surplus loans for coverage under policies issued to PACA in 2003-2004 should be credited to offset amounts PDS allegedly owes Park Avenue for policies it subsequently issued to PDS. The Receiver contends that PDS must

recover its claims deposit from PACA.

The initial issue is whether Park Avenue and PACA were, as PDS claims, in a principal-agency relationship. It is well settled that a principal-agent relationship may be based on a formal agreement or may be inferred from "conduct which shows that one is willing for the other to act for it, subject to its control, and that the other consents so to act." Bank of Okla. v. Briscoe, 911 P.2d 311, 317 (Okla.Civ.App.1996).[22] Parties also do not have to "intend to create the legal relationship or to subject themselves to the liabilities which the law imposes upon them as a result of it.'"[23] *Id.*

PDS argues that PACA acted as Park Avenue's agent because it sold insurance for Park Avenue. However, PDS has mischaracterized the relationship between Park Avenue and PACA. PACA was the insured, not PDS. PACA applied for and purchased workers compensation insurance from Park Avenue on behalf of its clients, which included PDA and other PEOs. PACA was not "attempting to sell insurance or asking or urging" other PEOs to apply to Park Avenue for workers' compensation coverage. *See* 36 Okla. Stat. § 1435.2(18) (defining "solicit"). As the Receiver explains, "[t]hough PDS is itself a PEO, the contractual relationship among the parties is no different than the relation between the insurer, a PEO, and a typical client of a PEO." Doc. #68, p. 24. PACA, through its

---

[22]*Although PDS acknowledges that Florida law might apply, it and the Receiver have proceeded on the assumption that Oklahoma law applies.*

[23]*The parties appear to agree that Oklahoma law applies to the principal-agent issue. Because, as PDS notes, "Park Avenue is an Oklahoma corporation and its dealings are subject to the laws of Oklahoma," Doc. #63, p. 31 n.3, the court will apply Oklahoma law to determine the agency question.*

arrangement with PDS and other PEOs, essentially enlarged its employee base.

Most of what PDS relies on to demonstrate Park Avenue's control over PACA is nothing more than what a workers compensation insurer demands of any insured, including the requirement that PACA had to remit premium payments, state assessment and loss adjusting expenses for the PEOs' insurance coverage, remit claims deposits to serve as reserves for open claims, and disclose all pertinent information about the PEOs " in order for Park Avenue to accurately write this business and know the risks [it] was insuring." Doc. #63, p. 17. Park Avenue, as the insurer, did set the terms and rates for the coverage it would make available, but PACA determined how much the sub-insureds would pay it for that coverage. The fact that PDS placed restrictions on whom it would insure – profitable PEOS and their client companies – reflects nothing more than sound business judgment.[24]

PDS's position would have more force if it had paid PACA a commission for each PEO, had dictated the terms of the agreements between PACA and the sub-insureds, or had issued the policies in the name of the sub-insureds. As discussed earlier, the court is not persuaded by PDS's attempt to characterize PACA's potential profits from its sub insureds as a "commission."[25] It also is not convinced that Park Avenue's agreement to provide PACA a share of the profits, even though none were paid, is evidence of an agency

---

[24]*PDS also asserts that Park Avenue required PACA to terminate any PEO which incurred an excessive loss ration. However, the deposition testimony cited to support that assertion negates it, Doc. #63-2, p. 1, depo. p.64 (Tharp depo.) The other cited evidence simply reflects that the issue was discussed at a meeting and agreed upon, but does not show that Park Avenue "required" it. Doc. #63-6.*

[25]*See supra note 10.*

relationship.  PDS states that "[p]rofit sharing is a common contingent commission given by insurers to its agents,"[26] yet cites no support, case authority, testimony or expert opinion, for that statement.  The fact that Park Avenue issued certificates of insurance in the names of the PEOs demonstrates nothing more than that the PEOs had, as required by state law, workers' compensation coverage.  Both PACA and the sub-insured's names were on the certificates, which referenced the policy numbers of the  policies issued to PACA as the insured.  *See* Doc. nos. #63-10, 68-3, 63-11, 68-4.

PDS also offers, as evidence that PACA was working "on behalf" of, or "soliciting" customers for, Park Avenue, the reference to "agent" in PDS's Exhibit 4 (Doc. #63-4).  The court has not considered that document for several reasons, including the lack of identity of the author.[27]  As described by PDS, it "represents terms discussed for the agreement between Park Avenue and PACA."  Doc. #63, p. 16.  Without more, it cannot be the basis for a determination that the relationship was one of principal and agent.

Additional support for the court's conclusion is found in the Oklahoma Producer Licensing Act, 36 Okla. Stat. §§ 1435.1-1435.41.  It provides in part that

> "Insurance producer" means a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance. Any person not duly licensed as an insurance producer, surplus lines insurance broker, or limited lines producer who solicits a policy of insurance on behalf of an insurer shall be deemed to be acting as an insurance agent within the meaning of the Oklahoma Producer Licensing Act, and shall thereby become liable for all the duties, requirements, liabilities, and penalties to which an insurance producer of the

---

[26]*Doc. #63, p. 18 n.1.*

[27]*See supra note 4.*

company is subject, and <u>the company by issuing the policy of insurance shall thereby accept and acknowledge the person as its agent in the transaction.</u> For purposes of the laws of this state and the Oklahoma Insurance Code, the term "insurance agent" shall have the same meaning as the term "insurance producer."

36 Okla. Stat. § 1435.2(7).    A finding that PACA solicited policies on behalf of Park Avenue would subject it to licensing and other requirements imposed on "insurance producers."  As the Receiver notes, that would conflict with state regulations governing PEOs which do not impose such obligations.[28]  The Oklahoma Producer Licensing Act prohibits an insurance producer from "act[ing] as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer." 36 Okla. Stat. § 1435.15(A).  Here there is no evidence that Park Avenue took the necessary steps to appoint PACA as its agent.  *See id.* at § 1435.15(B) ("To appoint a producer as its agent, the appointing insurer, or an authorized representative of the insurer, shall file, in a format approved by the Insurance Commissioner, a notice of appointment within fifteen (15) days from the date the agency contract is executed or the first insurance application is submitted.").

While the court recognizes that a principal can in some circumstances be liable for the acts of someone who is acting with apparent authority,  PDS's argument again fails for lack of proof.  "Apparent authority' of an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing. And the elements

---

[28]*PEOs are regulated entities.  See The Oklahoma Professional Employer Organization Recognition and Registration Act, 40 Okla. Stat. §§600.1-701 (professional employer organizations operating in Oklahoma are regulated by the Department of Insurance.).*

that must be present before a third person can hold the principal for the acts of the agent on the theory of apparent authority are (a) conduct of the principal, (b) reliance thereon by the third person, and (c) change of position by the third person to his detriment." Stephens v. Yamaha Motor Co. Ltd., 627 P.2d 439, 441 (Okla.1981) (internal quotations omitted). The evidence PDS cites to demonstrate PACA's "apparent authority" to act on Park Avenue's behalf is basically the same as what it relies on to establish actual agency, plus its execution of a surplus loan agreement (Doc. #63-12).

The testimony and documents PDS offers do not, though, show that it was somehow misled to believe that PACA was not acting on its own behalf in its interactions with PDS, but was actually representing Park Avenue. The Surplus Loan Agreement does state that the monies borrowed were being used to "to support the writing of insurance business by an approved carrier such as but not limited to the Providence Property & Casualty Insurance Company."[29] Id. However, neither that language nor the other provisions of the agreement support PDS's claim that it reasonably believed "it was in fact doing business with Park Avenue, through its agent PACA, when [it] decided to enter into the Surplus Loan Agreement with PACA." Doc. #63, p. 23, The fact that PACA loaned the funds to PHI, rather than directly to Park Avenue, does not somehow make PACA Park Avenue's agent.

"'[A]pparent authority exists only to the extent that it is reasonable for the third person

_____

[29]To the extent that PDS claims it was misled by the representation in its Surplus Loan Agreement with PACA that the monies were being paid to Park Avenue rather than PHI, its remedy is against PACA, the entity with whom it contracted.

dealing with the agent to believe that the agent is authorized.'" <u>Stephens</u>, 627 P.2d at 441

(quoting Restatement 2d, Agency, § 8, Comment c).   PDS has not offered evidence from

which a jury could conclude that it reasonable believed that it was actually doing business

with Park Avenue during the 2003-2004 time period.

PDS acknowledges that it, as the party asserting the existence of an agency

relationship, has the burden of proving it.  <u>Keel v. Titan Const. Corp.</u>, 639 P.2d 1228, 1230

(Okla. 1981).  PDS has not satisfied that burden.  It has not offered evidence sufficient to

create a justiciable question as to whether PACA consented to act subject to Park Avenue's

control and that Park Avenue was willing for PACA to act on its behalf or that PACA had

apparent authority to act as Park Avenue's agent.  It also has not provided any authority that

supports its position.  As the Receiver correctly notes, PDS has not cited "any case where a

complaining party seeks to recover from an insurer amounts paid to a purported 'agent' when

no policy is issued by the insurer to the complaining party."  Doc. #68, p. 25.  Therefore,

PDS is not entitled, on the ground that PACA was Park Avenue's agent, to offset any sums

it owes Park Avenue for policies Park Avenue issued to PDS in 2005-2007, with the claims

deposits or surplus loan money PDS paid PACA for coverage provided under policies issued

to PACA in 2003 and 2004.

As an alternative basis for avoiding liability on the Receiver's breach of contract

claims, PDS asserts that

> Park Avenue breached the terms of the agreements with PDS in November
> 2007 when, after telling PDS for two years running that Park Avenue held
> claims collateral amounts sufficient to satisfy claims collateral requirements

> attendant to the issuance of workers' compensation insurance and the provision of workers' compensation coverage to PDS, Park Avene suddenly advised that it held no claims collateral. Such disavowal of the deposit identified for PDS amounts to conversion of the deposit and breach of contract.

Doc. #80, pp. 16-17. The argument fails as PDS knew that the claims collateral could not be used to satisfy its 2005-2007 contractual obligations to Park Avenue without PACA's agreement to the transfer and also knew that the transfer had not occurred. Both PDS and Park Avenue acted as if the transfer had taken place, presumably because they assumed it was going to happen. PDS has not demonstrated that it was misled by the language in the renewal proposal for 2006 that Park Avenue "currently [held] $628,205 in Claims Collateral." Doc. #61-6., or that Park Avenue somehow "repudiated terms material to the Park Avenue workers' compensation policies by denying the existence of the claims collateral deposit it held and the capital surplus finds it had received and credited to PDS, totaling $1,452,405.20." Doc. #288, pp. 17-18.. PDS had not offered evidence sufficient to create a justiciable question as to whether Park Avenue breached its contracts with PDS or converted its funds. PDS's inability to establish its breach of contract claims forecloses its claim that Park Avenue breached the duty of good faith and fair dealing.

Having rejected PDS's arguments that PACA was operating as Park Avenue's agent in 2003 and 2004 and that Park Avenue breached its contracts with PDS by failing to offset amounts PDS owes Park Avenue with funds PACA received from PDS, the court concludes

PDS has breached its contracts with Park Avenue. The question, then, is the amount owed.[30]

The Receiver contends that PDS owes Park Avenue the principal amount of $1,833,071, $115,703 for Incurred But Not Reported claims ("IBNR reserves"), plus interest in the amount of $987,147. It also asserts that PDS is obligated for reserves totaling $409,492.65, which have been set by the guaranty associations administering remaining open claims under the Park Avenue-PDS policies.

PDS argues that it was not obligated under the terms of the 2005-2007 insurance policies to pay for "incurred claims development, developed losses or IBNR claims estimates." Doc. #80, p. 24. It contends that language to that effect in the proposal agreements it signed was not included in the policies and, as a result of the merger clauses in the policies, is not binding. The Receiver responds that the IBNR "simply allows the Receiver to liquidate damages and avoid multiplicity of lawsuits." Doc. #75, p. 4. It claims that PDS executed agreements for all three years and the parties intended for them to control their rights and obligations. It also asserts that PDS has attached the agreements to its pleadings and relied on them to support its breach of contract claim against Park Avenue.

The court agrees with PDS that the merger clause precludes the Receiver's recovery of the IBNR reserves. *See* 36 Okla. Stat. § 3621 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application attached to and

---

[30]*PDS's mitigation defense fails as it is based on the Receiver's failure to offset amounts paid pursuant to its agreement with PACA.*

made a part of the policy."). Its language is unambiguous – "The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy." Doc. #80-27. The parties' agreements pertaining to coverage for 2005-2007 were not referenced in the policies or made part of the policies by endorsement. The only decision cited by the Receiver to support its position, <u>Consedine v. Personnel Mgmt.</u>, 2013 WL 4780514 (5th Cir. Sept. 9, 2013), is distinguishable. The policies at issue in <u>Consedine</u> apparently did not include integration clauses and the parties acknowledged to the district court that they intended the separate "Insurance Program Agreements" to be enforceable.[31]

## Motions for Summary Judgment – between PDS and PACA

PDS filed a motion for partial summary judgment against PACA, seeking a declaration and determination that PACA must repay PDS its claims deposit in the amount of $628,502.28, as all claims resulting from coverage in 2003-2004 are closed, and $823,903.20 in surplus loan monies. PACA did not respond to the motion and thereby confessed it. LCvR7.1(g). The court has also considered the merits of the motion and finds PDS is entitled to the relief requested.

## Motion to Amend

In its motion to amend the Receiver seeks to amend its complaint to add HR3, Inc., d/b/a Simple HR ("HR3") as an additional defendant. The Receiver asserts that HR3 is the

---

[31]*The court's conclusion that the terms of the agreements pertaining to coverage are not enforceable precludes PDS from arguing that Park Avenue breached those agreements.*

23

successor entity to PDS and is liable for its debts because HR3 is "a mere continuation of Defendant formed for the fraudulent purpose of avoiding liability in this litigation." Doc. #54, p. 8. The Receiver claims that HR3 took the same trade name, "Simple HR," as PDS, and operates in the same location, with the same officers directors and registered agent as its asserted predecessor-in-interest. PDS responds that the motion should be denied for multiple reasons, including that HR3 was formed for the legitimate purpose of tax savings because of a change in Florida law, that it cannot be a successor entity because it did not acquire PDS's assets, that PDS is still operating and that the motion is untimely.

The court is not persuaded by PDS's argument that the Receiver unreasonably delayed in seeking to amend its complaint to join HR3 as it only recently learned PDS had ceased doing business and that HR3 had been created. Nonetheless, it concludes the motion should be denied. Allowing the amendment would require the determination of whether HR3 is subject to successor liability. That issue is unrelated to the matters that have been raised by the parties' various claims in this case and addressed by the court. It involves an out of state corporation that may not be subject to the court's jurisdiction and may require the application of another state's laws. Its resolution would necessitate a new scheduling order and entail discovery, dispositive motions and, potentially, a trial. PDS will be prejudiced by the injection of an essentially new claim in a case that is otherwise completed.[32] While the court recognizes that leave to amend should be granted "freely . . . when justice so requires."

---

[32]*The court recognizes, though, that PDS and HR3 may be responsible for creating the issue if HR3 is a successor corporation.*

Fed.R.Civ.P. 15(a)(2), the motion, filed as it is at the conclusion of an action that has been pending over five years, is untimely and will be denied.

<u>Conclusion</u>

As the court has concluded that the Receiver properly refused to credit payments PDS made to PACA, the Receiver is entitled to summary judgment on its breach of contract claims/counterclaims against PDS and on all PDS's claims/counterclaims against it, including PDS's claims for breach of fiduciary duty, negligence, breach of contract, equitable accounting and declaratory relief.[33] Accordingly, the Receiver's motions for summary judgment in CIV-09-622-HE [Doc. #281 ] and in CIV-12-457-HE [Doc. #61] are **GRANTED**. PDS's motions for summary judgment in CIV-09-622-HE [Doc. #283] and in CIV-12-457-HE [Doc. #63] are **DENIED**. PDS's motion to exclude the testimony of the Receiver's expert witness [Doc. #60] is **DENIED** as being **MOOT**.

PDS's motion for summary judgment against PACA in CIV-09-622-HE [Doc. #279] is **GRANTED**. The Receiver's motion to amend [Doc. #54] is **DENIED**.

The Receiver and PDS are directed to submit a joint proposed judgment within **ten (10) days** that reflects the court's resolution of all issues.[34]

_____

[33]*Certain claims pleaded by PDS were not specifically addressed by the parties in their motions, such as PDS's fraud claims. As those claims were based on conduct of the Receiver which the court has concluded was proper, they fail. Park Avenue also initially sought declaratory relief against PDS. That court assumes that claim and any other claim that is not specifically addressed by the parties in their briefs or by the court in this order is moot and encompassed by the judgment that will be entered.*

[34]*The judgment should reflect the court's determination that the Receiver is not entitled to recover "IBNR reserves" in the amount of $115,703.*

**IT IS SO ORDERED**.

Dated this 14th day of November, 2013.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE